THIRD DIVISION
March 31, 2008

1-06-3702

No. 1-06-3702


| | | |
|---|---|---|
| CORDECK SALES, INC., | ) | |
| | ) | Appeal from the |
| Plaintiff, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | |
| CONSTRUCTION SYSTEMS, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | No. 03CH6309 |
| | ) | |
| (A.L.L Masonry Construction Company, Inc., | ) | |
| Just Rite Acoustics, Inc., Reinke Gypsum | ) | |
| Supply Co., Stair One, Inc., AMEC Construction | ) | |
| Management, Inc., and Inland Electric | ) | |
| Corporation, | ) | |
| | ) | |
| Plaintiffs-Appellees; | ) | The Honorable |
| | ) | Clifford L. Meacham, |
| First Midwest Bank, | ) | Judge Presiding. |
| | ) | |
| Defendant-Appellant). | ) | |


JUSTICE GREIMAN delivered the opinion of the court:

Five subcontractors and one construction manager (collectively appellees) filed claims

seeking foreclosure of their mechanic's liens pursuant to the Mechanics Lien Act (770 ILCS 60/1

et seq. (West 2006)). First Midwest Bank (First Midwest), the holder of a valid mortgage lien on

the property, also filed a claim to foreclose its lien. The parties then engaged in discovery and

Bassam Hajyousif, the owner of two companies involved in the project, invoked his fifth

amendment privilege against self-incrimination. The trial court denied First Midwest's motion to compel Hajyousif to testify as well as its motion to continue the proceedings until Hajyousif could testify. Thereafter, the trial court found that each of the appellees' mechanic's liens had priority over First Midwest's mortgage lien. The appellees and First Midwest then filed cross-motions for summary judgment, wherein the parties disputed the validity and amounts of each of the appellees' mechanic's liens. The trial court granted each of the appellees' motions for summary judgement and denied each of First Midwest's motions. First Midwest has appealed and is seeking reversal of each of the trial court's summary judgment orders. Specifically, First Midwest asserts that reversal is warranted because the trial court erred when it: (1) permitted Hajyousif to invoke his fifth amendment privilege against self-incrimination on a blanket basis with respect to the project instead of on a question-by-question basis and compounded its error when it denied First Midwest's motion to continue the proceedings until Hajyousif was available to testify; and (2) found the defenses First Midwest asserted against each of the appellees to be meritless. We affirm as modified.

This appeal stems from a dispute among various parties involved in a construction project (Montreville Project or Project). The property at issue is a condominium building located at 520 N. Halsted Street in Chicago that contains 89 individual condominium units. At all relevant times, Northstar Trust Company (Northstar), as trustee, held the property in trust, with Savannah, Inc. (Savannah), named as the beneficiary of the trust. On February 4, 2000, Savannah contracted with AMEC Construction Management, Inc. (AMEC), to serve in the capacity of the "construction manager" on the Montreville Project.

Thereafter, on June 10, 2000, Savannah retained Construction Services International, Inc. (CSI), to perform general contracting services on the Montreville Project. Savannah and CSI had the same principals: Bassam Hajyousif and Romel Esmail. After being named the general contractor, CSI then entered into contracts with various second-tier contractors to provide subcontracting services on the Montreville Project. Specifically, CSI retained A.L.L. Masonry Construction Co., Inc. (ALL), to provide masonry services, Inland Electric Corp. (Inland) to provide electrical services, Chicago Drywall & Acoustical, Inc. (Chicago Drywall), to provide drywall and acoustic services, and Stair One, Inc. (Stair One), to provide steel services. Chicago Drywall, in turn, contracted with Just Rite Acoustics, Inc. (Just Rite), to install a suspension system for the drywall ceilings that were to be installed in the building and Reinke Gypsum Supply Co. (Reinke) to provide drywall and other interior building materials for use in the Project.

On April 30, 2001, Northstar, as trustee, obtained a $16,736,960 mortgage on the property through CoVest Banc, National Association (CoVest), First Midwest's predecessor-in-interest. The mortgage contract was subsequently modified and the loan amount increased to $23,145,981. The mortgage was recorded on May 11, 2001.

On or near the date the mortgage contract was executed, CoVest also obtained a loan policy of title insurance from Ticor Title Insurance Company (Ticor). The policy provided that Ticor would defend and indemnify CoVest for losses to the extent they were caused by title encumbrances. Coverage was provided by virtue of an escrow agreement entered into by Ticor, Savannah, and CoVest. The agreement provided that "[t]here will be MONTHLY disbursements, which are to be made in accordance with the terms and conditions of this escrow as hereunder set

forth." The terms of the escrow agreement required Ticor, the escrowee, to be furnished with various documents prior to disbursing funds from the construction escrow account including: a sworn general contractor's statement, a current dated sworn owner's affidavit, a certificate of inspection by the lender's inspector, as well as "[s]tatements, waivers, affidavits, supporting waivers and release of lien (if necessary), satisfactory to Ticor." After collecting the various documents and disbursing funds, the agreement also required Ticor to provide CoVest, the lender, with an endorsement, reflecting the validity and priority of CoVest's mortgage lien.

AMEC, Inland, Reinke, Just Rite, ALL, and Stair One each performed under their respective contracts. Initially, the appellees each received timely payments in exchange for the labor and services they provided on the Montreville Project. Ultimately, however, payments stopped. As a result, the appellees recorded mechanic's liens with the Cook County recorder of deeds and filed claims to foreclose their liens in the circuit court, the details of which will be set forth below.

On February 6, 2004, after the appellees recorded their lien claims and filed counterclaims to foreclose their mechanic's liens in the circuit court, CoVest filed a counterclaim to foreclose its mortgage lien totaling $23,808,829.19. Thereafter, First Midwest, "successor by merger to CoVest," entered into the litigation and filed responses to the appellees' counterclaims and asserted various affirmative defenses against them.

On February 26, 2004, the circuit court appointed a Receiver for the completion of the Project and sale of the completed condominium units. On March 26, 2004, the circuit court entered an order providing that the existing mechanic's liens would attach to the proceeds of the

4

sale of the condominium units upon their sale by the Receiver.

On October 14, 2004, the trial court entered default judgment in favor of the appellees and against Northstar, Savannah, and CSI due to their failure to comply with discovery. Thereafter, Inland, Reinke, Just Rite, and ALL moved for partial summary judgment against First Midwest on the issue of priority, asserting that their mechanic's liens had priority over First Midwest's mortgage lien because the underlying construction contract between Savannah and CSI predated the date of the recording of the mortgage. On March 24, 2005, the trial court entered an order finding that Inland, Reinke, Just Rite, and ALL's mechanic's' liens had priority over First Midwest's mortgage lien. AMEC also moved for partial summary judgment against First Midwest on the issue or priority, arguing its mechanic's lien had priority over First Midwest's mortgage lien because AMEC's contract with Savannah predated the date the mortgage was recorded. The trial court granted summary judgment in favor of AMEC on the issue of priority on October 24, 2005.

While the parties were disputing the issue of priority, they were also engaging in extensive discovery. Esmail and Hajyousif, the principal owners of Savannah and CSI, were both deposed. Representatives from First Midwest, AMEC, Inland, Reinke, and Just Rite were present for Hajyousif's June 7, 2005, deposition, and First Midwest was the first party to question Hajyousif. Initially, Hajyousif provided details about his educational and professional background as well as his introduction to the Montreville Project. Counsel for First Midwest then began to ask specific questions concerning the Montreville Project and Hajyousif's knowledge of the entities involved in the Project. Specifically, counsel questioned Hajyousif as to his role in Savannah, the identity

of the person who kept Savannah's corporate records, the date CSI was formed, and the process by which Hajyousif purchased the property. In response to each question, Hajyousif cited the fifth amendment and refused to answer. Counsel then asked Hajyousif whether he intended to invoke the fifth amendment on a blanket basis in response to questions concerning the Montreville Project. Specifically counsel queried: "Is it your intention to assert the Fifth Amendment on all questions relating to the structure or acts of Savannah, Inc.?"and "Is it your intention to assert the Fifth Amendment with respect to all matters involving yourself and the 520 North Halsted Street project?" and "Is it also your intention to assert the Fifth Amendment with respect to [CSI's] contracts for improvement to the property on both ends, both in terms of its relationship with the owner and with respect to its relationships with contractors?" Hajyousif answered affirmatively to each of these questions. Thereafter, First Midwest's counsel, with the consent of Hajyousif's counsel, decided that First Midwest would appear before the trial court and let the court determine the propriety of Hajyousif's blanket assertion of his fifth amendment privilege instead of continuing with the deposition "because there is no point in having a deposition transcript that's five feet thick just to have the Fifth Amendment asserted time after time."

Accordingly, First Midwest's counsel stopped his inquiry. Counsel for AMEC, Inland, Reinke, and Just Rite however, took turns questioning Hajyousif. Unlike First Midwest's counsel, they asked specific questions concerning Hajyousif and the Montreville Project despite Hajyousif's continued invocation of his fifth amendment privilege.

On August 3, 2005, First Midwest filed a motion to compel in the trial court, asserting that Hajyousif did not have a reasonable basis to assert his fifth amendment privilege because he

"did not provide evidence of any danger of prosecution."[1] First Midwest attached a copy of Hajyousif's deposition transcript to its motion. Thereafter, the trial court conducted an evidentiary hearing on First Midwest's motion to compel.

At the hearing, Jennifer Nielsen, attorney for Zeman Concrete Corporation (a subcontractor that provided services on the Project, but is not a party to this appeal), testified that during the course of her representation of Zeman, she was contacted by a Federal Deposit Insurance Corporation (FDIC) employee who informed her he was investigating Hajyousif and the Montreville Project, specifically the "tens of millions of dollars of funds that have disappeared out of the project." Accordingly, he questioned Nielson about the process by which payments are typically disbursed from construction escrow accounts and about lien wavers. The FDIC employee never informed Nielsen directly that a criminal proceeding would be brought against Hajyousif, but did indicate that he had obtained Hajyousif's personal bank records.

Peter Bedard, the attorney representing AMEC, also provided testimony at the hearing. He testified that in May 2005, he met with representatives from the FDIC, Federal Bureau of Investigation (FBI), and Internal Revenue Service (IRS) who indicated that they were investigating "monetary fraud issues" in connection with the Montreville Project as well as another project in which Hajyousif and Esmail were involved. The FDIC, FBI, and IRS employees indicated they were investigating Hajyousif and Esmail individually as well as the corporate entities involved in the projects and informed Bedard that they had subpoenaed

[1] The record reveals that Esmail also invoked his fifth amendment privilege at his deposition; however, First Midwest subsequently settled with him and never filed a motion to compel his testimony in the trial court.

Hajyousif's and Esmail's individual bank records and that a grand jury had been seated. The federal investigators then asked Bedard various questions concerning the disbursement of funds, lien waivers, sworn affidavits from subcontractors, and the tasks performed by various subcontractors.

After hearing the aforementioned testimony, counsel for First Midwest and Hajyousif delivered closing remarks. Counsel for First Midwest argued that a blanket assertion of Hajyousif's fifth amendment privilege was inappropriate. Specifically, he contested the scope of his privilege, arguing that Hajyousif failed to show that various areas of inquiry had "a reasonable nexus to the possibility of criminal conviction."

Counsel for Hajyousif responded, noting that counsel for First Midwest did not dispute that federal investigators were investigating Hajyousif and his involvement with the Project. Moreover, counsel also contested the manner in which First Midwest was seeking review of the scope of Hajyousif's privilege and argued that "it is the duty of the party taking the deposition and asking the questions to ask all the questions that they intend to ask so that we can more squarely note exactly what they're asking." Finally, in response to First Midwest's argument as to the breadth of Hajyousif's fifth amendment privilege, counsel maintained that Hajyousif was entitled to invoke his fifth amendment privilege against self-incrimination on a broad basis because the scope of the federal investigation was broad. Counsel argued that if Hajyousif were to answer some questions and assert his privilege in response to other questions, he would essentially provide federal investigators with a roadmap as to how to conduct their investigations, which could prove to be incriminating.

8

During the hearing, the trial court never conducted a review of individual deposition questions. Nonetheless, based on the evidence revealed and the arguments delivered at the hearing, the trial court found that Hajyousif's blanket assertion of his fifth amendment privilege in relation to the Monteville Project was appropriate and denied First Midwest's motion to compel. Specifically, the court stated: "In my judgment, there's a reasonable basis for asserting a privilege against self-incrimination; and therefore, it's not inappropriate to invoke that privilege.*** [Hajyousif] can assert it on a blanket basis with respect to the [P]roject."

Thereafter, on December 13, 2005, First Midwest filed a "Motion for Continuance Based on Bassam Hajyousif's Unavailability" pursuant to Supreme Court Rule 231(a) (134 Ill. 2d R. 231(a)). In its motion, First Midwest sought to stay all trial court proceedings "until such time as Hajyousif is available to testify," asserting that it was "materially prejudiced" by Hajyousif's assertion of his fifth amendment privilege. Attached to the motion was the affidavit of James Dash, one of the attorneys of record for First Midwest. In the affidavit he averred that "Mr. Hajyousif is a key witness on at least the following topics: (i) the contracts of, and work performed by, the various subcontractors who have asserted claims against or through CSI or Savannah; (ii) AMEC's contract and performance; (iii) CSI's payment for work performed on the Project. The breadth and detail of the knowledge he is likely to have appears to be unique."

The trial court denied the motion on December 15, 2005. In doing so, the court remarked that it was "troubled by the fact that persons [other than Hajyousif] with direct and firsthand knowledge have not been deposed." Accordingly, the court cited First Midwest's failure to seek discovery through other witnesses and its belief that Hajyousif's "assertion of the Fifth

9

Amendment was well founded" as its reasons for the denial of First Midwest's motion for a continuance.

Thereafter, the appellees and First Midwest filed cross-motions for summary judgment regarding the validity and amount of each of the appellees' mechanic's liens, the substance of which will be set forth below. The trial court granted each of the appellees' motions and denied each of First Midwest's motions. On November 30, 2006, the trial court entered a final order ordering the disbursement of money to satisfy the appellees' lien claims. First Midwest filed a timely notice of appeal.

On appeal, First Midwest advances numerous arguments that purportedly compel reversal of the trial court's summary judgment orders. Some of the arguments pertain to individual lien claimants while others pertain to the appellees as a whole. We first will address the two arguments that First Midwest asserts against all of the appellees and then will turn to the specific arguments that First Midwest raises against the individual lien claimants.

In reviewing First Midwest's arguments, we note that summary judgment is appropriately granted where the "pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2006); Tefco Construction Co. v. Continental Community Bank & Trust Co., 357 Ill. App. 3d 714, 718 (2005). Although summary judgment has been deemed a "drastic means of disposing of litigation" (Purtill v. Hess, 111 Ill. 2d 229, 240 (1986)), it is nonetheless an appropriate mechanism to employ to expeditiously dispose of a lawsuit when the moving party's right is clear and free from doubt

1-06-3702

(Morris v. Margulis, 197 Ill. 2d 28, 35 (2001)). "Where, as here, 'the parties have filed cross-motions for summary judgment, they agree that no genuine issue as to any material fact exists and that only a question of law is involved, and they invite the court to decide the issue based on the record.' " SBC Holdings, Inc. v. Travelers Casualty & Surety Co., 374 Ill. App. 3d 1, 8 (2007), quoting Gawryk v. Firemen's Annuity & Benefit Fund of Chicago, 356 Ill. App. 3d 38, 41 (2005). Nonetheless, " 'the mere filing of cross-motions for summary judgment does not require that the court grant the requested relief to one of the parties where genuine issues of fact exist precluding summary judgment in favor of either party.' " State Farm Insurance Co. v. American Service Insurance Co., 332 Ill. App. 3d 31, 36 (2002), quoting Travelers Insurance Co. of Illinois v. Eljer Manufacturing, Inc., 307 Ill. App. 3d 872, 878 (1999). Our standard of review is de novo. SBC Holdings, 374 Ill. App. 3d at 8; Tefco, 357 Ill. App. 3d at 718.

First Midwest first asserts that the trial court committed reversible error when it found that Hajyousif could invoke his fifth amendment privilege "on a blanket basis rather than determining such rights on a question-by-question basis" and thus "denied First Midwest access to critical evidence." At oral argument, First Midwest conceded it was not arguing that Hajyousif did not have a valid basis to assert his fifth amendment privilege, but rather, it simply was contesting the manner in which the trial court reviewed its motion to compel and ruled upon the scope of Hajyousif's privilege. Collectively, the appellees respond that First Midwest has waived any argument concerning Hajyousif's fifth amendment privilege because First Midwest failed to attach an affidavit pursuant to Rule 191(b) (210 Ill. 2d R. 191(b)) to any of its summary judgment pleadings. Alternatively, the appellees assert that the trial court properly found that Hajyousif

11

1-06-3702
could invoke his privilege against self-incrimination on a blanket basis with respect to the Montreville Project.

We initially address the appellees' waiver argument, to which First Midwest has failed to respond. Rule 191(b) permits a party filing pleadings pertaining to summary judgment or involuntary dismissal to submit an affidavit stating that material facts are known only to persons whose affidavits the affiant has been unable to secure by reason of hostility or otherwise. 210 Ill. 2d R. 191(b); Kane v. Motorola, Inc., 335 Ill. App. 3d 214, 224-25 (2002). A party that fails to attach a Rule 191(b) affidavit to its pleading to address its discovery need may not later seek reversal of the trial court's order on the basis that it was denied important discovery. See Kane, 335 Ill. App. 3d at 224-25 (finding that appellants waived their argument that the trial court abused its discretion in limiting the scope of discovery because they failed to attach a Rule 191(b) affidavit to their summary judgment pleadings); Intercontinental Parts, Inc. v. Caterpillar, Inc., 260 Ill. App. 3d 1085, 1090-91 (1994) (same); see also Lazar Brothers Trucking, Inc. v. A&B Excavating, Inc., 365 Ill. App. 3d 559, 565 (2006) (finding that a mechanic's lien claimant waived its argument pertaining to discovery because it failed to attach a Rule 191(b) affidavit to its response to the owner's motion to dismiss its lien claim).

Here, during the discovery stage of litigation, First Midwest, AMEC, Reinke, Inland and Just Rite sought to depose Hajyousif, but he invoked his fifth amendment privilege against self-incrimination, thus preventing the parties from obtaining answers to questions pertaining to the Montreville Project. As a result, First Midwest filed a motion to compel Hajyousif to testify, which the trial court denied, as well as a motion to continue the proceedings, which the trial court

12

also denied. Thereafter, the parties filed cross-motions for summary judgment. First Midwest did not utilize Rule 191(b) to reassert its discovery need to oppose the appellees motions for summary judgment or to support its own motions for summary judgment. Accordingly, it may not now seek reversal of the trial court's summary judgment orders on the basis that Hajyousif's testimony was necessary to oppose the motions. Kane, 335 Ill. App. 3d at 224-35; Lazar, 365 Ill. App. 3d at 565; Intercontinental Parts, 260 Ill. App. 3d at 1090-91. Accordingly, First Midwest has waived this argument. Notwithstanding waiver, First Midwest's claim has no merit.

The fifth amendment provides that "[n]o person *** shall be compelled in any criminal case to be a witness against himself." U.S. Const., amend. V; People v. Collins, 366 Ill. App. 3d 885, 892 (2006). The privilege against self-incrimination "is one of the most fundamental rights under the Constitution of the United States." CHB Uptown Properties, LLC v. Financial Place Apartments, LLC, 378 Ill. App. 3d 105, 108 (2007). This privilege, however, extends to only to witnesses who have a "reasonable cause to apprehend danger from a direct answer." Hoffman v. United States, 341 U.S. 479, 486, 95 L. Ed. 1118, 1124, 71 S. Ct. 814, 818 (1951). Although the privilege against self-incrimination must be liberally construed in favor of the witness asserting the privilege (People v. Brown, 303 Ill. App. 3d 949, 962 (1999)), the trial court must conduct a careful inquiry to determine whether the witness's fear of incrimination is reasonable, and if so, how far the privilege extends. Ohio v. Reiner, 532 U.S. 17, 149 L. Ed. 2d 158, 121 S. Ct. 1252 (2001); People v. Mileris, 103 Ill. App. 3d 589, 595 (1981). Specifically, "the court is required to conduct a hearing into whether a witness has 'reasonable cause to apprehend danger from a direct answer.' " People v. Craig, 334 Ill. App. 3d 426, 446 (2002), quoting Hoffman, 341 U.S. at 486,

1-06-3702
95 L. Ed. 2d at 1124, 71 S. Ct. at 818.

A party in a civil case may invoke his privilege against self-incrimination to prevent the disclosure of information that could be used against him in a criminal proceeding. CHB Uptown, 378 Ill. App. 3d at 108. As a rule, when a witness in a civil case invokes his fifth amendment privilege during a deposition and the propriety of his invocation is subsequently challenged, "the trial court is obliged to scrutinize each disputed question and rule on the reasonableness of the [witness's] refusal to answer." 10-Dix Building Corp. v. McDannel, 134 Ill. App. 3d 664, 671 (1985); see also Galante v. Steel City National Bank of Chicago, 66 Ill. App. 3d 476, 482 (1978); People ex rel. Mathis v. Brown, 44 Ill. App. 3d 783, 787 (1976). However, "the propriety of invoking the privilege must be determined by the court when the question is presented to it in an appropriate fashion." Mathis, 44 Ill. App. 3d at 787.

In 10-Dix, a defendant in a civil embezzlement action was deposed. After stating her name and address, she invoked the fifth amendment in response to all subsequent questions. 10-Dix, 134 Ill. App. 3d at 667. The propriety of the defendant's privilege was subsequently challenged. Despite being presented with deposition questions, the trial court failed to "conduct a particularized review of the deposition questions, even though the record reflects that" such a review was requested. 10-Dix, 134 Ill. App. 3d at 671. We found that the trial court failure to conduct a question-by-question analysis was erroneous and remanded for further proceedings. 10-Dix, 134 Ill. App. 3d at 673.

Similarly in Mathis, a defendant in a paternity action refused to answer questions at his deposition, citing the fifth amendment. The State presented the trial court with a copy of the

14

questions that the defendant had refused to answer and requested the trial court to compel the defendant to answer. The trial court reviewed some of the disputed questions, but "did not go through all of the questions which had remained unanswered." Mathis, 44 Ill. App. 3d at 785. Accordingly, we found that the trial court's procedure was "erroneous." Mathis, 44 Ill. App. 3d at 785.

In this case, unlike the parties challenging a witness's invocation of the fifth amendment privilege in 10-Dix and Matthis, First Midwest did not continue to ask Hajyousif specific questions when he began to assert his privilege against self-incrimination. Instead, First Midwest's counsel merely asked if Hajyousif intended to assert the fifth amendment on a blanket basis with respect to various areas concerning the Montreville Project. Specifically, counsel queried: "Is it your intention to assert the Fifth Amendment on all questions relating to the structure or acts of Savannah, Inc.?" and "Is it your intention to assert the Fifth Amendment with respect to all matters involving yourself and the 520 North Halsted Street project?" and "Is it also your intention to assert the Fifth Amendment with respect to [CSI's] contracts for improvement to the property on both ends, both in terms of its relationship with the owner and with respect to its relationships with contractors?" First Midwest then filed a motion to compel, which the trial court denied. Although the record reveals that the trial court did not examine individual deposition questions, First Midwest failed to provide the trial court with a record that allowed for question-by-question review. Because First Midwest failed to ask specific questions of Hajyousif when he invoked his fifth amendment privilege, it may not now challenge the trial court's order denying its motion to compel on the grounds that the trial court failed to review Hajyousif's claim

15

on a question-by-question basis. Accordingly, because First Midwest failed to challenge the propriety of Hajyousif's invocation of his fifth amendment privilege in an appropriate manner, we find that the trial court did not err in denying First Midwest's motion to compel.

In its reply brief, First Midwest asserts for the first time, that the trial court's order denying its motion to compel was also erroneous because Hajyousif waived his fifth amendment privilege by providing deposition testimony on November 21, 2003, in a separate, but related case. AMEC, Just Rite, and Reinke filed a surreply brief, which Inland and Stair One subsequently joined, and argued that we cannot review First Midwest's claim because First Midwest failed to include a copy of the deposition transcript in the record on appeal. Thereafter, we permitted First Midwest to file a sur-surreply brief and to supplement the record with the deposition transcript.

The transcript reveals that during the November 2003 deposition, Hajyousif provided testimony concerning the relationship between CSI and Savannah in connection with a construction project undertaken at 6 North Michigan in Chicago. He acknowledged that he and Esmail were officers of CSI, that CSI was the general contractor on the 6 North Michigan project, and that CSI became "defunct" and money had not been paid to all of the subcontractors that provided work on that construction project.

Initially, we note that First Midwest waived this argument by raising it for the first time in its reply brief. See 210 Ill. 2d. R. 341(h)(7) ("Points not argued are waived and shall not be raised in the reply brief"); Kulchawik v. Durabla Manufacturing Co., 371 Ill. App. 3d 964, 971 (2007). Moreover, because this deposition was never presented to the trial court, First Midwest cannot in

16

good faith argue that the trial court erred in denying its motion to compel on this basis. Nevertheless, we find First Midwest's waiver argument to be meritless.

Although the fifth amendment privilege against self-incrimination can be waived (People v. Accardo, 195 Ill. App. 3d 180 (1990)), waiver of the privilege "is not lightly to be inferred" (Smith v. United States, 337 U.S. 137, 150, 93 L. Ed. 1264, 1274, 69 S. Ct. 1000, 1007 (1949)). Moreover, "the doctrine of waiver is limited to the particular proceeding in which the voluntary testimony is given." People v. Walker, 28 Ill. 2d 585, 588 (1963); see also Novak v. Rathnam, 106 Ill. 2d. 478, 484 (1985) (recognizing that the privilege against self-incrimination "attaches to the person in each case in which the person may be called to testify" and that a person who "testifies in one proceeding does not waive his right to invoke the self-incrimination privilege in a separate and independent proceeding"). Accordingly, a witness does not waive his right to invoke his fifth amendment privilege against self-incrimination at trial simply because he provided prior testimony before a grand jury in the same case (Craig, 334 Ill. App. 3d at 445-46) or because he provided testimony at a prior related trial (People v. Stufflebeam, 19 Ill. App. 3d 462, 463-64 (1974)).

Keeping these principles in mind, we find that Hajyousif did not waive his right to invoke his fifth amendment privilege in this case when he provided deposition testimony in 2003. The deposition that First Midwest relies upon in support of its waiver argument was provided in a completely different case and was conducted approximately two years prior to the deposition in this case. Hajyousif's actions in providing testimony in a separate proceeding did not serve to waive his right to assert his fifth amendment privilege in this case. Walker, 28 Ill. 2d at 588-89;

17

1-06-3702
Craig, 334 Ill. App. 3d at 445-46; Shufflebeam, 19 Ill. App. 3d at 463-64.

In a related claim, First Midwest asserts the trial court, after denying First Midwest's motion to compel, further erred when it denied First Midwest's subsequent motion to continue the case until Hajyousif was available to testify. The appellees maintain the trial court properly denied First Midwest's motion to continue, filed pursuant to Supreme Court Rule 231 (134 Ill. 2d R. 231), because that rule only permits continuances during the trial phase of litigation not during discovery or summary judgment stages. Alternatively, the appellees contend that the trial court's order was proper because it was based on First Midwest's lack of due diligence in attempting to procure discovery from other sources.

As a threshold matter, we need not decide whether First Midwest's motion to continue the case was properly filed under Supreme Court Rule 231 because " '[t]he nature of a motion is determined by its substance rather than its caption.' " Shutkas Electric, Inc. v. Ford Motor Co., 366 Ill. App. 3d 76, 81 (2006), quoting J.D. Marshall International, Inc. v. First National Bank of Chicago, 272 Ill. App. 3d 883, 888 (1995). Accordingly, we find the appellees' argument that the trial court's order should be upheld simply because First Midwest's motion was allegedly filed pursuant to the wrong rule to be unpersuasive, and we will thus address the merits of First Midwest's claim.

As a general rule, the fact that a party involved in a civil proceeding invokes his fifth amendment privilege against self-incrimination "does not *** mandate a stay of [the] civil proceeding[] pending the outcome of similar or parallel criminal proceedings." Jacksonville Savings Bank v. Kovack, 326 Ill. App. 3d 1131, 1135 (2002); see also People ex rel. Hartigan v.

18

1-06-3702

Kafka & Sons Building & Supply Co., 252 Ill. App. 3d 115, 119 (1993). The party seeking to stay the civil proceeding in which the fifth amendment has been invoked bears the burden of proving that a stay is appropriate. CHB Uptown, 378 Ill. App. 3d at 109. In considering whether to grant a stay, a court may consider various factors, including: (1) the procedural posture of the criminal case; (2) whether the criminal case involves the same subject matter as the civil case; (3) whether the government is a party to both cases; (4) the interests of the party invoking his fifth amendment privilege; (5) the interest of the public; (6) the prejudice to the plaintiff in not proceeding with the case; and (7) the interest of the court in managing its docket. CHB Uptown Properties, 378 Ill. App. 3d at 108-09; Jacksonville Savings, Ill. App. 3d at 1136. As a general rule, when no formal criminal charges have been brought against the individual asserting his fifth amendment privilege, "a stay is not normally appropriate" because it interferes with the court's ability to manage its docket. Jacksonville Savings, 326 Ill. App. 3d at 1137.

Based on the facts in the record, we do not find that the trial court erred in denying First Midwest's motion for a continuance. Notably, First Midwest has not cited nor has it discussed the aforementioned relevant factors used to review a motion to continue trial court proceedings. 210 Ill. 2d R. 341(h)(7) ("Points not argued are waived"); Kulchawik, 371 Ill. App. 3d at 971-72. Accordingly, we need not conduct our own extensive review here.

However, we do note that the record reveals that the trial court's order denying First Midwest's motion to compel was based, in part, on the fact that it was "troubled" that First Midwest had not attempted to depose other witnesses before seeking the continuance. Based on the trial court's finding that First Midwest lacked due diligence, we cannot say the denial of First

19

Midwest's motion amounted to error. See, e.g., Parker v. Newman, 10 Ill. App. 3d 1019, 1025 (1973) (a trial court does not err in denying a motion for a continuance if it finds that the movant failed to exercise due diligence in proceeding with the cause). In addition, we note that although evidence was presented that showed that Hajyousif was under federal investigation for his involvement in the Montreville Project at the time he asserted his fifth amendment privilege, he had not yet been formally charged. See Jacksonville Savings, 326 Ill. App. 3d at 1137, quoting Trustees of the Plumbers & Pipefitters National Pension Fund v. Transworld Mechanical, Inc., 886 F. Supp. 1134, 1139 (S.D.N.Y. 1995) (explaining that " 'stays will generally not be granted before an indictment is issued' " because the trial court would essentially have to postpone the case indefinitely, thus burdening its ability to effectively manage and control its docket). Indeed, at oral argument, First Midwest conceded that because Hajyousif had not yet been charged it was essentially seeking to continue the case indefinitely. Based on these facts, we do not find that the trial court erred in denying First Midwest's motion for a continuance.

We now address the specific arguments that First Midwest advances against each of the mechanic's lien claimants. At oral argument, First Midwest agreed that based on a review of the relevant appellees' contract formation dates as well as the recording date of the mortgage, the appellees' mechanic's lien claims would ordinarily have priority over its mortgage lien claim. See State Bank of Lake Zurich v. Winnetka Bank, 245 Ill. App. 3d 984, 990-93 (1993) (recognizing that the effective date of a mechanic's lien claim is the date of the contract, the effective date of a mortgage is the date the mortgage was recorded, and that priority between the two is determined based on a comparison of those dates). However, First Midwest maintains that based upon the

various arguments and defenses it asserted against the lien claimants in the trial court, the court erred in awarding summary judgment in favor of each of the mechanic's lien claimants. We will first address the arguments that First Midwest has asserted against AMEC.

**AMEC**

AMEC was the "construction manager" of the Montreville Project. AMEC's contract with Savannah, executed on February 4, 2000, provided that AMEC would provide construction management services, act as Savannah's agent, and specified that AMEC was "NOT a Constructor."

After providing services pursuant to its construction management contract, AMEC recorded its mechanic's lien with the Cook County recorder of deeds on April 16, 2003, asserting a lien totaling $749,640.45 for work provided through March 31, 2003. AMEC subsequently recorded an amended mechanic's lien on June 27, 2003, asserting its right to a lien amounting to $929,468.82, reflecting work provided by AMEC through May 1, 2003. AMEC also filed a counterclaim in the circuit court on June 27, 2003, to foreclose its lien totaling $929,468.82 against Northstar, Savannah, CSI, CoVest, and other parties. In its counterclaim, AMEC alleged it entered into a contract with Savannah on February 4, 2000, to provide construction management services on the Montreville Project in exchange for a fee of 3.75% of the direct and indirect costs of work on the Project and that it was owed $929,468.82. AMEC's counterclaim also included breach of contract, unjust enrichment and quantum meruit claims against Savannah.

After filing its counterclaim in the circuit court, AMEC subsequently recorded three additional amended mechanic's liens with the Cook County recorder of deeds. Specifically,

AMEC recorded an amended claim on August 13, 2003, and asserted a lien claim totaling $1,030,358.44 for work performed through June 30, 2003. Its next amended claim was recorded on September 23, 2003, and included a claim for $1,173,926.44, reflecting work provided through August 31, 2003. AMEC's final amended lien claim was recorded on November 17, 2003, and sought to recover $1,318,965.72 for work performed through October 31, 2003. After AMEC recorded its final mechanic's lien with the Cook County recorder of deeds, it filed an amended counterclaim to foreclose its lien in the circuit court on December 10, 2003, reciting the same charges made in its original counterclaim and seeking to foreclose its mechanic's lien, which now totaled $1,318,965.72.

Thereafter, AMEC filed a motion for summary judgment and turnover of funds. Citing the trial court's two prior orders entering summary judgment against Northstar, Savannah, and CSI, and finding that AMEC's mechanic's lien had priority over First Midwest's mortgage lien, AMEC asserted it was entitled to summary judgment because "there is no dispute of fact over the allegations in AMEC's counterclaim and *** AMEC has a first priority lien over the property." Accordingly, AMEC urged the trial court to enter judgment in its favor in the amount of $1,318,965.72.

Attached to AMEC's motion were a number of exhibits including several affidavits. James Ladd, a project executive at AMEC, submitted an affidavit in which he averred that AMEC entered into a construction management contract with Savannah but that, during the course of the contract, AMEC was also "forced to fulfill the typical day-to-day duties and responsibilities of a general contractor" because CSI, the named general contractor, "did not have any presence on the

Project on a day to day basis." Accordingly, Ladd stated that AMEC employed project managers, superintendents, carpenters, and laborers. AMEC also submitted an affidavit completed by Michael Gora, AMEC's senior project manager on the Montreville Project, who confirmed that AMEC was hired as the construction manager but was forced to fulfill the role of the general contractor due to CSI's lack of presence on the Project. Gora averred that AMEC supervised, directed, and coordinated the work on the Project, inspected work and rejected defective work, and reviewed and made recommendations concerning change order requests. AMEC also affixed the affidavit of Lisa Romanelli, AMEC's territory controller, who stated that AMEC did not receive payment for "any of the work it performed on the Project from November 2002 through October 2003" and verified that "there remains due and owing to AMEC an amount in excess of $1,318,965.72."

In response to AMEC's motion and in support of its own cross-motion for summary judgment, First Midwest argued that AMEC was not a "contractor" as defined by the Act because its contract with Savannah designated AMEC as the "construction manager" of the Project and identified AMEC as Savannah's "agent." First Midwest also contended that even if AMEC did provide lienable work, including general contracting services and labor, the lienable work it provided was insignificant, and AMEC's failure to allocate between the lienable and nonlienable work it provided on the Project was fatal to AMEC's claim. Moreover, First Midwest maintained that AMEC's inclusion of nonlienable material in its lien claim amounted to constructive fraud. First Midwest did not, however, attach any affidavits rebutting those submitted with AMEC's motion.

23

In addition to its cross-motion, First Midwest also filed a motion for partial summary judgment as to amount against AMEC. First Midwest, citing section 7 of the Act, asserted that AMEC's amended lien claims could not be asserted against First Midwest due to its status as a third-party incumbrancer of the property. Accordingly, First Midwest maintained that in the event AMEC's mechanic's lien was entitled to priority, its recovery amount was limited to $749,640.45, the sum identified in its first recorded mechanic's lien claim.

After reviewing the pleadings submitted by both parties, the trial court granted AMEC's motion for summary judgment and denied First Midwest's cross-motion, stating, "having considered the Briefs and having heard oral argument, it is hereby ordered: [1.] The motion for summary judgment of AMEC Construction Management, Inc. is granted. First Midwest's Cross-motion for summary judgment is denied. [2.] AMEC is entitled to and awarded a valid and subsisting mechanics lien in the amount of $1,318,965.72 together with statutory interest at the rate of 10% per annum and costs." The trial court also denied First Midwest's partial motion for summary judgment as to amount.

On appeal, First Midwest disputes the trial court's findings. Initially, First Midwest maintains that the trial court improperly granted summary judgment in favor of AMEC because AMEC is not a "contractor" as defined by the Act because its contract did not call for AMEC to provide lienable services. First Midwest's claim is premised on the fact that AMEC is identified as a "construction manager" and "agent" of the owner in its contract with Savannah, and accordingly, based on this language, the contract did not call for AMEC to provide lienable work under section 1 of the Act (770 ILCS 60/1 (West 2006)).

24

The Act is a comprehensive statutory enactment that outlines the rights, responsibilities, and remedies of parties to construction contracts, including owners, contractors, subcontractors, and third parties. Lazar Brothers Trucking, Inc., v. A&B Excavating, Inc., 365 Ill. App. 3d 559, 562 (2006); Struebing Construction Co. v. Golub-Lake Shore Place Corp., 281 Ill. App. 3d 689, 694 (1996). Its overall purpose is " 'to require a person with an interest in real property to pay for improvements or benefits which have been induced or encouraged by his or her own conduct.' " Stafford-Smith, Inc. v. Intercontinental River East, LLC, 378 Ill. App. 3d 236, 240 (2007), quoting Levyfilm, Inc. v. Cosmopolitan Bank & Trust, 274 Ill. App. 3d 348, 352 (1995). A party's status as a "contractor," as this term is defined by the Act, is significant because contractors are entitled to assert liens under the Act. 770 ILCS 60/1(a) (West 2004); Candice Co. v. Ricketts, 281 Ill. App. 3d 359, 362 (1996). Because the right to a mechanic's lien is statutory, however, "a contractor must strictly comply with the Act to be eligible for relief." Matanky Realty Group, Inc. v. Katris, 367 Ill. App. 3d 839, 841 (2006); see also Tefco Construction Co., Inc. v. Continental Community Bank & Trust Co., 357 Ill. App. 3d 714, 719 (2005) (recognizing that "[w]hile the Act should be construed liberally as a remedial one, being in derogation of common law, it is strictly construed with reference to the requirements upon which the right to a lien depends"). One basic requirement for a party seeking to assert a mechanic's lien under the Act as a contractor is to meet the statutory definition of this term. 770 ILCS 60/1 (West 2006).

The term "contractor" is defined in section 1 of the Act. 770 ILCS 60/1 (West 2006). Pursuant to a recent amendment, (Pub. Act 94-627, eff. January 1, 2006), section 1 of the Act

was modified and currently defines the term "contractor" as

> "[a]ny person who shall by any contract or contracts, express or implied, or partly expressed or implied, with the owner of a lot or tract of land, or with one whom the owner has authorized or knowingly permitted to contract, to improve the lot or tract of land *** or to *manage a structure under construction thereon.*" (Emphasis added.) 770 ILCS 60/1(a) (West 2006).

As a threshold matter, First Midwest maintains that because the phrase "to manage a structure under construction thereon," was added to section 1 by virtue of the recent amendment, AMEC may not rely upon this provision to assert a mechanic's lien because its construction management contract was formed in 2000, "long before this provision took effect." Accordingly, First Midwest asserts that because the Act, as it existed at the time AMEC entered into its contract, did not define a contractor as a party that contracted to "manage a structure under construction thereon," AMEC is not a contractor and its contract did not call for AMEC to provide lienable services under the Act.

First Midwest misreads the nature of the change effectuated by the amendment. Prior to the 2006 amendment, section 1 of the Act provided:

> "Any person who shall by any contract or contracts, express or implied, *** with the owner of a lot or tract of land, *** to improve the lot or tract of land or *to manage a structure thereon*, or to furnish material, fixtures, apparatus or machinery *** or perform any services or incur any expenses as an architect, structural engineer, professional engineer, land surveyor or property manager in, for or on a tract of land for any such

26

1-06-3702

purpose *** is known under this Act as a contractor, and has a lien upon the whole of

such lot or tract of land." (Emphasis added.) 770 ILCS 60/1 (West 2004).

Accordingly, the 2006 amendment did not, as First Midwest claims, "add contracts 'to manage a

structure under construction thereon' to the list of lienable contracts under section 1 of the Act."

Rather, Public Act 94-627 simply added the phrase "under construction thereon" to the

preexisting phrase "manage a structure."[2]

Though no cases are directly on point, several cases have implicitly recognized the right of

construction managers to assert mechanic's liens under the prior version of the Act. See Contract

Development Corp. v. Beck, 255 Ill. App. 3d 660, 669 (1994) (suggesting in dicta that a lien

claimant who was retained as a construction manager and performed preconstruction services

could assert a lien claim as a property manager under the Act); see also Northwest Millwork Co.

v. Komperda, 338 Ill. App. 3d 997, 1003 (2003) (reversing a trial court order dismissing an action

brought by a party retained to provide construction management services to foreclose a

mechanic's lien under the Act and ordering further consideration of the construction manager's

claim).

First Midwest's argument that AMEC is not a contractor is thus premised on an incorrect

reading of the statute and the recent amendment. Here, there is no dispute that AMEC signed a

contract to provide construction management services on the Montreville Project and manage the

construction of the condominium complex. AMEC thus meets the Act's definition of a

contractor, which at the time AMEC formed its contract, defined the term as one with a contract

---

[2] The phrase "manage a structure" was added to the Act by Public Act 84-702 (Pub. Act 84-702, eff. September 20, 1985).

27

to "manage a structure." 770 ILCS 60/1 (West 2004). Our conclusion that AMEC is a contractor is supported not only by a plain language of the statute, but also by the legislative history of the recent amendment, which reveals that the overall purpose of the amendment was to provide much-needed clarification to the Act.

A subsequent statutory amendment may be an appropriate source to determine legislative intent. Knolls Condominium Ass'n v. Harms, 202 Ill. 2d 450, 461-62 (2002); People v. Parker, 123 Ill. 2d 204, 211 (1988). In cases where the legislative history indicates that an amendment is intended as a clarification of existing law, it may be interpreted and applied as such. See, e.g., In re Detention of Lieberman, 201 Ill. 2d 300, 322-23 (2002), quoting 91st Ill. Gen. Assem., House Proceedings, March 3, 2000, at 192 (statement of Rep. Turner) (finding that an amendment to the Sexually Violent Persons Commitment Act was intended to be a clarification based, in part, on the comments of the House sponsor of the bill who indicated that the bill contained "cleanup language"); Jacobson v. General Finance Corp., 227 Ill. App. 3d 1089, 1097 (1992), quoting 87th Ill. Gen. Assem., Senate Proceedings, May 22, 1991, at 245 (statement of Sen. Jacobs) (finding that the amendment to the Illinois Interest Act was intended as a clarification based in part on comments by Senator Jacobs, who stated: "This bill, as amended, *** clarifies that the prepayment section of the Interest Act [citation] does not apply to the installment loan rate").

Here, Public Act 94-627 was introduced to the Illinois legislature as Senate Bill 1930. In addressing members of the House of Representatives, Representative George Scully stated:

"For those of you who have had the misfortune of trying to read this piece...this statute [the Mechanics Lien Act], it's very confusing. The...it has been a patchwork of quilts...of

28

patches put on this quilt over the past hundred years. *This Bill attempts to clarify the language without making significant substantive changes* other than changes necessary to codify existing case law, giving people who are reading the Mechanics Lien Statute the ability to simply read the statute and also at the same time to get an understanding and a statement of what the existing case law is interpreting this very old statute." (Emphasis added.) 94 Ill. Gen. Assem., House Proceedings, May 31, 2005, at 17-18 (statement of Rep. Scully).

Representative Scully's statements explaining that the overall purpose of the amendment to the Act was to provide clarification thus provides further support that AMEC's construction management contract called for the provision of lienable services and that AMEC is a contractor as this term is defined by section 1 of the Act.

First Midwest, however, cites to <u>Oakley v. Crawford Electric, Inc.</u>, Nos. 2005-CA-001471-MR, 2005-CA-001487-MR (Ky. App. October 6, 2006) and <u>Shively v. Bellville Township High School District No. 201</u>, 329 Ill. App. 3d 1156 (2002), where courts found that parties that signed construction management contracts were not contractors. However, neither of these cases addressed a construction management contract in the context of the Act, and, accordingly, neither is persuasive. <u>Oakley</u>, slip op. at 1-2 (finding that a construction manager did not meet the definition of a contractor as defined by the Kentucky Workers' Compensation Act); <u>Shively</u>, 329 Ill. App. 3d at 1160 (discussing the differences between contractors and construction managers in the context of the bidding requirements of the Illinois School Code).

First Midwest nonetheless also asserts that AMEC is not a contractor under section 1 of

29

the Act because the construction management contract identified AMEC as Savannah's "agent" and specified that AMEC did not assume responsibility for the subcontractors. Notably, First Midwest cites no authority that an agency relationship precludes a finding that a party is a contractor under the Act. 210 Ill. 2d R. 341 (h)(7) (arguments raised on appeal must be supported "with citation of the authorities and the pages of the record relied on"); Golf v. Henderson, 376 Ill. App. 3d 271, 280 (2007). In addition, this term is used in the contract to clarify AMEC's role with respect to third parties who provided work on the Project, not to alter AMEC's construction management duties. Finally, we note that First Midwest's argument finds no support in the Act because section 1 expressly provides that "any person" who contracts with an owner to "manage a structure" is a contractor. 770 ILCS 60/1 (West 2006). There is no agency exception.

We note however, that although AMEC's contract called for the provision of construction management services, there is no dispute that AMEC, in effect, assumed the role of the general contractor on the Project. Specifically, James Ladd, AMEC's project executive, and Michael Gora, AMEC's senior project manager, submitted affidavits in which each averred that although AMEC entered into a construction management contract with Savannah, AMEC was ultimately required to also provided general contracting services on the Project because CSI, the named general contractor, did not maintain a presence on the Project. According to Ladd and Gora, AMEC was thus required to provided additional services "above and beyond those set forth" in the contract, including "day-to-day construction sequencing, coordination, supervision, direction or control" on the Project, as well as carpentry work, minor demolition, cleanup, and hand

excavation. Ladd acknowledged at his deposition that AMEC provided these services even though its construction management contract had not been amended or altered in any way to include the provision of any of these services.

First Midwest submitted no affidavits contradicting those provided by Ladd and Gora detailing the nature of the services that AMEC provided on the Project, and accordingly, we must accept their statements as true. Central Illinois Light Co. v. Home Insurance Co., 213 Ill. 2d 141, 170-71 (2004); F.H. Paschen/S.N. Nielsen, Inc. v. Burnham Station, L.L.C, 372 Ill. App. 3d 89, 93 (2007). Nonetheless, First Midwest maintains that AMEC is not entitled to recover for the lienable work it provided as a general contractor because "such work was necessarily pursuant to an agreement other than the [construction manager] contract because, as Ladd testified, the [construction manager] contract was never modified." Accordingly, "to the extent that work was done under another agreement, it was not described in any of AMEC's recorded lien claims," and as a result, pursuant to section 7 of the Act (770 ILCS 60/7 (West 2006)), First Midwest asserts that AMEC's lien claim is invalid because it incorrectly described the contract pursuant to which AMEC asserted its lien.

To properly perfect a lien claim against either an owner or a third party, a mechanic's lien claimant must "comply with the prerequisites in section 7 of the Act." Tefco, 357 Ill. App. 3d at 719; see also Federal Savings & Loan Insurance Corp. v. American National Bank & Trust Co. of Chicago, 115 Ill. App. 3d 426, 428 (1983). Section 7 requires a lien claimant seeking to assert a lien claim against a third party such as a "creditor or incumbrancer or purchaser" to file a claim within four months of its completion date that contains "a brief statement of the [claimant's]

contract." 770 ILCS 60/7 (West 2006); see also Tefco, 357 Ill. App. 3d at 719. A lien claim that contains an incorrect description of the contract for which the lien is asserted is invalid. See, e.g., Candice, 281 Ill. App. 3d at 364 (lien claim that incorrectly named the parties to the contract was invalidated because it contained an incorrect description); Ronning Engineering Co. v. Adams Pride Alfalfa Corp., 181 Ill. App. 3d 753 (1989) (lien claim was invalidated because the claim reflected that the lien was based upon a verbal contract formed in 1985 when it was actually based upon a written contract executed in 1986).

Here, unlike the lien claimants in Candice and Ronning, there is no evidence that AMEC provided an incorrect description of the contract pursuant to which it asserted a lien claim. The record reveals that at all times AMEC provided services pursuant to a single contract, the construction management contract. Although AMEC provided services above and beyond that which was provided for in that contract, we do not find that AMEC's claim should be defeated on this basis because Ladd's and Gora's uncontradicted affidavits established that AMEC's performance of the additional work was necessary to effectively manage the Project due to CSI's failure to fulfill its role as the general contractor of the Montreville Project.

First Midwest nonetheless asserts that AMEC's lien claim must fail for various other reasons. Specifically, First Midwest maintains that AMEC failed to allocate any lienable work it performed from the nonlienable work it provided and that its failure to do so necessarily invalidates AMEC's lien claim.

First Midwest is correct that under Illinois law, "[l]ienable work must be separable from nonlienable work and the total amount due must be apportionable or the entire lien is defeated."

32

Flader Plumbing & Heating Co. v. Callas, 171 Ill. App. 3d 74, 77 (1988); see also BRL

Carpenters, Ltd. v. American National Bank & Trust Co., 126 Ill. App. 3d 137, 142 (1984). In

this case, First Midwest asserts that AMEC's lien includes nonlienable work and thus its claim

must fail. Specifically, First Midwest maintains that AMEC's fee, which James Ladd, AMEC's

project executive, stated in his deposition represented "compensation for profit and overhead," is

not lienable because profit and overhead alone are not lienable under section 1 of the Act. First

Midwest, however, fails to cite to any authority to support its claim, and accordingly, we deem it

waived. 210 Ill. 2d R. 341(h)(7); Golf, 376 Ill. App. 3d at 280. Moreover, there is nothing

inherently unlienable about fees, as contractors have been permitted to assert liens for fees

provided for in a construction contract. See, e.g., Blohm v. Kagy, 341 Ill. App. 468, 472 (1950)

(finding that party was entitled to a mechanic's lien that included costs as well as the 10% fee

provided for in the contract). Accordingly, we find that First Midwest's argument that AMEC's

claim must be defeated due to its failure to allocate between lienable and unlienable work is

without merit.

In a related claim, First Midwest maintains that AMEC's inclusion of its fee in its

mechanic's lien claim resulted in constructive fraud and accordingly AMEC's lien claim must fail.

The Act provides that a mechanic's lien claim will not "be defeated to the proper amount

thereof because of an error or overcharging on the part of any person claiming a lien therefor

under this Act, unless it shall be shown that such error or overcharge is made with intent to

defraud." 770 ILCS 60/7 (West 2006). When a lien claimant knowingly records a lien that

contains a substantial overcharge, its claim will be defeated on the basis of constructive fraud.

1-06-3702

See, e.g., Lohmann Golf Designs, Inc. v. Keisler, 260 Ill. App. 3d 886, 891 (1994); Fedco

Electric Co. v. Stunkel, 77 Ill. App. 3d 48, 51 (1979); Marsh v. Mick, 159 Ill. App. 399, 405-06

(1911).

In this case, First Midwest maintains that "[e]ven if some of the services furnished by

AMEC are lienable, over 34% of AMEC's claim is its fee that clearly is non-lienable profit and

overhead. AMEC's inclusion of its fee in its lien claim alone renders the claim constructively

fraudulent." However, because we found that First Midwest failed to establish that AMEC's fee is

inherently unlienable, AMEC's inclusion of its fee in its lien claim is not erroneous and does not

amount to constructive fraud. Accordingly, First Midwest's constructive fraud argument has no

merit.

We now address First Midwest's final argument, that pursuant to section 7 of the Act,

AMEC's amended claim is not enforceable against First Midwest due to its undisputed status as a

third-party incumbrancer of the property.

In addition to setting forth the substantive requirements of a valid mechanic's lien claim,

section 7 also details strict procedural requirements that a lien claimant must abide by to assert a

valid lien claim, which vary depending upon the type of party against whom the lien claimant

seeks to assert its lien. 770 ILCS 60/7 (West 2006); Stafford-Smith, 378 Ill. App. 3d at 240-41.

With respect to third parties such as "creditor[s] or incumbrancer[s] or purchaser[s]" of the

property, a lien claimant must record its claim within four months after the completion of its

work. 770 ILCS 60/7 (West 2006); Stafford-Smith, 378 Ill. App. 3d at 241. In contrast, when a

lien claimant seeks to enforce a mechanic's lien against an owner, the claimant has two years

34

following the completion of its work to record its lien. 770 ILCS 60/7 (West 2006); Stafford-Smith, 378 Ill. App. 3d at 241. In addition, section 7 provides that a lien claim "as to such owner may be amended at any time before the final judgment." 770 ILCS 60/7 (West 2006); Federal Savings, 115 Ill. App. 3d at 428.

Relying on our prior holding in Federal Savings, First Midwest, an undisputed third-party incumbrancer, asserts that the absence of language in section 7 permitting amendments against third parties prohibits AMEC from asserting its amended mechanic's lien claim against it. In Federal Savings, a contractor recorded its mechanic's lien claim on January 14, 1980, which identified September 26, 1979, as its completion date, and then recorded an amended claim on October 27, 1980, this time citing January 10, 1980, as its completion date. The amended claim attempted to correct various errors in the original claim including the contract formation date and the contract purpose. The trial court granted the third-party lender's motion for summary judgment, finding that its mortgage lien had priority over the contractor's mechanic's lien. The contractor appealed, asserting that its lien claim could be amended after the statutory filing period has expired because an amendment relates back to the date of the filing of the original claim and further asserting that section 7's provision allowing amendment "at any time before the final judgment" as applied to "owners" should also be extended and applied to third parties. Federal Savings, 115 Ill. App. 3d at 427-28.

We disagreed that section 7 allowed amended lien claims to be asserted against third parties, stating:

"By explicitly providing for amendments to lien claims against owners, under the

traditional rule of statutory construction the statute implicitly precludes amendments as to all other parties. Thus [the contractor's] attempted amendment to its lien claim against and to the prejudice of plaintiff, an undisputed third-party encumbrancer, is not permitted under the Act. [Citation.]

Moreover, were we to accept [the contractor's] argument that mechanic's lien claims may be amended as to all parties despite apparent legislative intent to the contrary, [it's] lien claim fails nonetheless because its amendment was filed after the [four-month] statutory period expired." Federal Savings, 115 Ill. App. 3d at 428-29.

AMEC, however, maintains that First Midwest interprets Federal Savings too broadly and that our previous holding has no applicability to the current case because Federal Savings did not address the types of amendment at issue here. In this case, AMEC recorded its first lien claim on April 16, 2003. Thereafter, AMEC filed amended mechanic's lien claims on June 7, 2003, August 13, 2003, September 23, 2003, and November 17, 2003, each of which reflected additional work that AMEC performed on the Montreville Project. Accordingly, AMEC maintains that because its lien claims were recorded while it continued to perform work on the Project, none of its claims were filed outside the four-month period required by the Act. Accordingly, unlike the amendment in Federal Savings, which occurred more than four months after the contractor's completion date, AMEC maintains that its amendments were timely and, accordingly, our Federal Savings holding does not prohibit AMEC's final amended claim from being enforced against First Midwest.

AMEC's argument disregards our finding that "the statute implicitly precludes amendments as to *** [third] parties." Federal Savings, 115 Ill. App. 3d at 428. Moreover, we

note that this same argument and interpretation of the Federal Savings case was raised and rejected in In re Acme Metals Inc., 257 B.R. 714 (Bankr. Del. 2000). There, "[d]espite the express holding of the Federal Savings Court," the defendant argued that the Federal Savings "Court's ruling should be limited to the most narrow holding that is necessary: that amendments beyond the four month period are invalid." In re Acme Metals, 257 B.R. at 719. The Acme Metals court however, declined to do so because it would be contrary to the statutory construction of section 7 of the Act. In re Acme Metals, 257 B.R. at 719. Specifically, the court held: "It is a fundamental rule of statutory construction that where a statute expressly allows an action as to one party, it implicitly does not allow it as to all other parties. *** Thus, we conclude that the Illinois statute, by allowing amendment of mechanic's liens as to owners (770 ILCS 60/7), meant to disallow amendment as to all other parties." In re Acme Metals, 257 B.R. at 719.

AMEC, without acknowledging the Acme Metals opinion, however, asserts that other cases have interpreted the Federal Savings holding more narrowly and specifically points to Braun-Skiba v. La Salle National Bank, 279 Ill. App. 3d 912 (1996) and Lyons Federal Trust & Savings Bank v. Moline National Bank, 193 Ill. App. 3d 108, 117 (1990). We find AMEC's reliance on these cases unpersuasive. Although Federal Savings is cited for various propositions in both cases, neither case conducted any analysis concerning amended lien claims or engaged in any discussion regarding the enforceability of such claims against third parties. Braun-Skiba, 279 Ill. App. 3d at 917; Lyons, 193 Ill. App. 3d at 116-118. Indeed, AMEC points to no case applying Federal Savings in the manner urged by it on appeal.

Accordingly, we agree with First Midwest that pursuant to section 7 of the Act, AMEC is

not entitled to assert its amended mechanic's lien claim against First Midwest due to First Midwest's undisputed status as a third-party incumbrancer of the property. However, we disagree with First Midwest's characterization of the nature of relief to which it is entitled. In its opening brief, and in the trial court, First Midwest asserted that AMEC's claim could not be enforced "above the original $749,640.45," the amount specified in AMEC's original recorded claim. However, in its reply brief, First Midwest asserts, for the first time, that AMEC's amended counterclaim, based upon AMEC's fifth amended lien claim, was subject to dismissal as a void claim and, accordingly, the trial court committed reversible error in not doing so. First Midwest's failure to raise this argument in its opening brief and to cite to any authority to support this assertion results in waiver of this argument. 210 Ill. 2d R. 341(h)(7). Moreover, we disagree that AMEC's fifth amended lien claim and its amended counterclaim are void. AMEC is permitted to amend its lien claim against the owner "at any time before the final judgment." 770 ILCS 60/7 (West 2006); Federal Savings, 115 Ill. App. 3d at 428. Accordingly, AMEC's amended mechanic's lien claim and the amended counterclaim based thereon are not inherently void; however, they simply cannot be asserted against First Midwest, an undisputed third-party incumbrancer. We thus find that AMEC's lien claim only has priority over, and can only be enforced against, First Midwest to the amount of $749,640.45, the amount identified in AMEC's original claim.

For the foregoing reasons, the trial court's order granting summary judgment in favor of AMEC is affirmed as modified.

**REINKE**

38

We now address the arguments First Midwest asserts against Reinke, a second-tier subcontractor that provided drywall materials and services on the Montreville Project. CSI initially contracted with Chicago Drywall to provide interior construction services on the Montreville Project. On September 25, 2002, in order to comply with the terms of its subcontract, Chicago Drywall formed a contract with Reinke that called for Reinke to provide drywall materials and services.

On April 16, 2003, after performing in conformance with the terms of its subcontract, Reinke recorded its mechanic's lien claim with the Cook County recorder of deeds, asserting a lien for $150,054.86. Thereafter, on August 11, 2003, Reinke filed a counterclaim to foreclose its lien in the circuit court. In its counterclaim, Reinke alleged that its contract with Chicago Drywall called for it to furnish drywall and other materials for the Montreville Project in exchange for payment totaling $152,070.61 and that it had performed under the contract until March 14, 2002. Reinke's complaint further alleged that it had only received payments amounting to $77,168.75, leaving a total unpaid balance of $74,901.86. Reinke's counterclaim also included a breach of contract claim against Chicago Drywall.

Thereafter, First Midwest sought summary judgment against Reinke, relying primarily upon the lien waiver defense it had raised in its answer to Reinke's counterclaim. Specifically, First Midwest asserted that based on the terms of Reinke's February 14, 2003, lien waiver, entitled "Partial Waiver of Lien," Reinke completely waived its lien rights. Reinke's waiver provided:

"The undersigned, for and in consideration of *** $52,349.60 Dollars, and other good and

39

valuable consideration, the receipt whereof is hereby acknowledged, do(es) hereby waive

and release any and all lien or claim of, or right to, lien, under the statutes of the State of

Illinois, relating to mechanics' liens, with respect to and on said above-described premises,

and the improvements thereon, and on the material, fixtures, apparatus or machinery

furnished, and on the money, funds or other considerations due or to become due from the

owner, on account of labor, services, material, fixtures, apparatus or machinery heretofore

furnished, or which may be furnished at any time hereafter, by the undersigned for the

above-described premises."

Noting that Reinke identified March 14, 2003, as its completion date, First Midwest contended

that the February 14, 2003, waiver, which provided that Reinke waived its right to assert a lien for

materials and labor "hereto furnished, or which may be furnished at any time hereafter," resulted

in a complete waiver of Reinke's lien rights. Alternatively, First Midwest argued it was entitled to

summary judgment because Reinke's lien claim was overstated by $51,014.98 due to its failure to

account for two prior payments that Reinke had received prior to recording its lien claim, and

accordingly, based on the size of the overstatement, First Midwest contended that Reinke's claim

was constructively fraudulent.

Reinke responded to First Midwest's motion, arguing that First Midwest's lien waiver

defense was invalid because First Midwest failed to provide any evidence that there was any

reliance on its lien waiver in making payment. Moreover, Reinke asserted that the record was

devoid of any evidence of reliance. Specifically, Reinke pointed to the deposition testimony of

Pamela Hitzemann, a construction escrow officer at Ticor, who was unable to provide details

40

about Ticor's receipt and reliance on Reinke's February 14, 2003, lien waiver. Reinke also rejected First Midwest's constructive fraud argument. Reinke admitted that its lien claim had been overstated by $26,195.83, but denied that the overstatement had been made with an intent to defraud. Reinke maintained that the affidavit of Richard Fischer, Reinke's former chief financial officer, refuted First Midwest's charge that the overstatement had been made intentionally. In his affidavit, Fischer stated that at the time he requested a mechanic's lien to be prepared on Reinke's behalf, Reinke was owed its full contract price. Although he acknowledged that Reinke received a $26,195.83 payment prior to the time Reinke's claim was recorded, Fischer averred that he had not been aware of the payment at the time he signed Reinke's lien claim. Accordingly, Fischer maintained: "At no time was it my intention to overstate the amount of Reinke's lien claim."

Reinke also filed a cross-motion for summary judgment, asserting that it was entitled to summary judgment because there was no genuine issue of material fact that Reinke provided labor and materials amounting to $152,070.61 pursuant to the terms of its subcontract, and that there remained an unpaid balance of $74,901.86. Reinke's motion was supported by the affidavit of Tim Batey, Reinke's branch manager, who confirmed the total price of the materials and services that Reinke provided and stated he was unaware of any dissatisfaction with Reinke's performance.

First Midwest responded to the pleadings filed by Reinke, objecting to Reinke's attempt to place the burden on it to provide proof that payment was made in good-faith reliance on Reinke's waiver. First Midwest also objected to Reinke's characterization of Hitzemann's deposition testimony and argued that the declaration that Hitzemann submitted "directly establishes reliance by Ticor on the February 14, 2003, lien waiver." First Midwest, in particular, pointed to

1-06-3702

Hitzemann's statement that "[i]t was [her] practice to require Waivers of Lien [including the February 14, 2003, lien waiver] before disbursing checks. Accordingly, Ticor relied on its receipt of the [waiver] in disbursing funds." Moreover, First Midwest insisted that Reinke's lien claim was constructively fraudulent because although Fischer admitted in his affidavit that Reinke's lien claim, filed April 18, 2003, failed to account for a $26,195.83 payment received on March 20, 2003, his affidavit did not address the fact that the contractor's affidavit attached to Reinke's February 14, 2004, lien waiver indicated that it had already received a $24,819.15 payment. Accordingly, First Midwest argued that Reinke's failure to account for two prior payments amounting to $51,014.98 constituted constructive fraud.

After reviewing the pleadings filed by both parties, the trial court granted Reinke's cross-motion for summary judgment and denied First Midwest's motion, finding that "Reinke is entitled to and awarded a valid and subsisting mechanics lien in the amount of $74,901.86 together with statutory interest at the rate of ten percent (10%) per annum from April 18, 2003 (the date on which Reinke recorded its mechanics lien claim with the Cook County Recorder)." In so holding, the trial court found that there was no evidence of reliance on Reinke's February 14, 2003, lien waiver because Hitzemann's declaration was entitled to no weight and that Reinke did not engage in constructive fraud.

On appeal, First Midwest disputes the trial court's findings. First Midwest first asserts that the trial court erred in granting summary judgment in favor of Reinke because Reinke executed an unambiguous lien waiver on February 14, 2003, that resulted in a complete waiver of Reinke's lien rights. Reinke does not dispute that it executed the waiver, but asserts the trial

42

court correctly found that First Midwest's defense had no merit because it failed to satisfy its burden of proving that there was any reliance on the waiver in making payment.

As a general rule, "a clear, unambiguous waiver of lien rights bars an action under the Mechanics' Lien Act." Luczak Brothers, Inc. v. Generes, 116 Ill. App. 3d 286, 298 (1983). Thus rule, however, is only applicable when an innocent party relies on the waiver in making payments. Luczak, 116 Ill. App. 3d at 298. Whether an innocent party has relied on a lien waiver is a question of fact. Merchants Environmental Industries, Inc. v. SLT Realty Ltd. Partnership, 314 Ill. App. 3d 848, 863 (2000); Luczak, 116 Ill. App. 3d at 298.

Initially, First Midwest, citing our prior decision in Lazar Brothers Trucking, Inc. v. A&B Excavating, Inc., 365 Ill. App. 3d 559 (2006), maintains that the trial court improperly allocated the burden to it to establish proof of innocent reliance. In Lazar, a contractor (A&B) provided a property owner (Schmidt) with a lien waiver that failed to identify the subcontractor (Lazar). A&B received payment from Schmidt but failed to use the money received to pay Lazar. Because Lazar never received payment for its services, it sought to foreclose a mechanic's lien against Schmidt. Schmidt, in turn, filed a motion to dismiss Lazar's claim based on the lien waiver provided by A&B, which the trial court granted. Lazar, 365 Ill. App. 3d at 561-62. Lazar appealed, arguing that Schmidt did not rely on the waivers in good faith because it had knowledge that Lazar provided labor and materials on the construction project. Accordingly, Lazar sought reversal of the trial court's order because Schmidt failed to prove that it relied on the waivers in good faith. We rejected Lazar's claim, finding that the owner had no such burden, stating:

"Lazar contends that the lien waivers do not provide sufficient support for

43

the judgment in favor of Schmidt, because Schmidt failed to present evidence proving that it relied on the affidavits in good faith. We disagree. The lien waivers from A&B established a prima facie defense to Lazar's claim for a mechanics lien. William Aupperle & Sons, Inc. v. American National Bank & Trust Co. of Chicago, 28 Ill. App. 3d 573, 576 (1975). Lazar had the burden of avoiding the effect of the waivers. Aupperle, 28 Ill. App. 3d at 576. Because Lazar argues that Schmidt acted in bad faith, in that Schmidt did not reasonably rely on the lien waivers, Lazar needed to present evidence sufficient to 'raise a genuine issue of material fact as to whether there was such reliance.' [Merchants, 314 Ill. App. 3d at 866.]" Lazar, 365 Ill. App. 3d at 563.

Because Lazar failed to provide any evidence that the owner did not rely on the waivers in good faith, we affirmed the dismissal of Lazar's complaint. Lazar, 365 Ill. App. 3d at 564.

Reinke, however, asserts that Lazar has no application to the current case because the Lazar ruling is "limited to instances in which the lien claimant has alleged bad faith reliance by the owner on the affidavits which the owner knows to be false." We disagree. Like the subcontractor in Lazar, Reinke disputes the existence of good-faith reliance on its lien waiver. While the subcontractor in Lazar disputed good-faith reliance by asserting bad faith, and Reinke disputes good-faith reliance by arguing that there was no reliance, we find this difference to be immaterial. Moreover, we note that Reinke presents an alternative argument and asserts that if its waiver was relied upon, it was only relied upon as a partial, rather than a complete, waiver of Reinke's lien rights. This was the same argument presented by the lien claimants in Aupperle and

Merchants, the two cases relied upon in Lazar to place the onus on the lien claimant to avoid the effect of the waiver. See Aupperle, 28 Ill. App. 3d at 576; Merchants, 314 Ill. App. 3d at 863. Accordingly, we disagree that Lazar is inapplicable to the case at hand.

Nonetheless, Reinke recites the well-established legal principle that it is the party raising an affirmative defense that bears the burden of proof. See, e.g., Wright v. Pucinski, 352 Ill. App. 3d 769, 772 (2004). We agree. However, Lazar does not change this principle. It is still the burden of the party seeking to assert a lien waiver affirmative defense to produce the lien waiver and raise that defense. The lien waiver then constitutes a prima facie defense to a mechanic's lien claim. Lazar, 365 Ill. App. 3d at 563 (2006); Aupperle, 28 Ill. App. 3d at 576. "A 'prima facie' defense is sufficient at law unless and until rebutted by other evidence." Darling & Co. v. Pollution Control Board, 28 Ill. App. 3d 258, 264 (1975). Accordingly, once the lien waiver is produced, the burden shifts to the party against whom the waiver is asserted to avoid the effect of the waiver. Lazar, 365 Ill. App. 3d at 563; Aupperle, 28 Ill. App. 3d at 576. Thus, in this case, we agree with First Midwest that it is the burden of Reinke, who disputes reliance on its lien waiver, to "raise a genuine issue of material fact as to whether there was such reliance." Merchants, 314 Ill. App. 3d at 866.

Reinke maintains that it can satisfy this burden and asserts that the deposition of Pamela Hitzemann, a senior construction escrow officer at Ticor, provides evidence that there was no reliance on its lien waiver. First Midwest, however, asserts that because the language in Reinke's lien waiver is clear and unambiguous, Reinke may not point to extrinsic evidence to contradict the plain language and plain meaning of its waiver.

45

Initially, we agree with First Midwest that Reinke's lien waiver is clear and unambiguous. Reinke's waiver provided that in exchange for payment of $52,349, "the receipt of which is hereby acknowledged," Reinke waived its right to assert a lien for labor and materials "hereto furnished, or which may be furnished at any time hereafter." We have previously found lien waivers containing similar language to be unambiguous. See, e.g., Merchants, 314 Ill. App. 3d at 852 (finding that a lien waiver stating that "in consideration of a payment of $31,938, 'the receipt whereof is hereby acknowledged' " the lien claimant " 'do(es) hereby waive and release any and all lien' " for work " 'furnished to this date' " was clear and unambiguous). However, for the purposes of summary judgment, consideration of extrinsic evidence as to reliance on lien waivers is permissible. Merchants, 314 Ill. App. 3d at 863. Specifically, in evaluating a lien waiver defense, it is appropriate to consider evidence relating to the customary practice of the parties as well as the practices in the industry with respect to lien waivers. Merchants, 314 Ill. App. 3d at 863; see also Premier, 132 Ill. App. 3d at 492 (recognizing that "questions of customary practice between the parties and trade usage in the industry are also appropriately raised in the context of the effect of a subcontractor's lien waiver").

For example, in Premier, we considered affidavits submitted by a lien claimant (Premier) and an owner to determine the nature of the reliance on the claimant's lien waiver. There, Premier executed a lien waiver dated July 13, 1981, waiving its right to assert a mechanic's lien claim for work "furnished to this date." The owner moved for summary judgment, arguing that Premier's lien claim was waived in its entirety because Premier identified May 31, 1981, as its completion date. The trial court granted summary judgment in favor of the owner, finding that

46

Premier executed the waiver voluntarily and was bound by its terms. Premier, 132 Ill. App. 3d at 492.

On appeal, Premier argued that there were questions of fact as to the nature of the reliance on its lien waiver that precluded summary judgment. Specifically, Premier maintained that despite the contrary language in the waiver itself, the parties only relied on the waivers as partial waivers as to the amount identified in the waiver, not as to the date of the waiver. We reviewed the extrinsic evidence presented by the parties concerning the nature of the reliance. Specifically, we noted that the affidavit of Premier's vice president supported Premier's claim that the waiver was only relied upon as a partial waiver of lien. In his affidavit, Premier's vice president averred that during the construction process, payments were made in reliance on the waivers, which both Premier and the owner knew did not reflect the full amount owed. The owner, on the other hand, submitted an affidavit completed by one of its employees, who stated that the owner relied upon the language of the lien waiver in authorizing Premier's payment. Based on these contrary affidavits, we found that there was a factual dispute as to the nature of the reliance and remanded the cause for further proceedings. Premier, 132 Ill. App. 3d at 492-93.

Similarly, in Merchants, we also reviewed extrinsic evidence to address the issue of reliance on a lien waiver submitted by a subcontractor (MEI). There, MEI appealed a summary judgment order in favor of the owners of a construction project, asserting in pertinent part that its waiver was not relied upon as a complete waiver of its lien rights. The waiver at issue in Merchants was dated August 29, 2007, and stated that in consideration of payment of $31,938 MEI waived its right to assert a lien for labor and materials furnished to the date of the waiver.

Despite the unambiguous language of the waiver, we found it permissible to consider the evidence proffered by MEI to support its argument that its waiver was only relied upon as a partial waiver of its lien rights.

In particular, we noted that the sworn contractor's affidavit attached to MEI's lien waiver identified a large balance ($219,347.95), beyond the amount of the payment sought in the waiver, that remained due to MEI and stated: "We question whether it is reasonable to infer that the defendants believed in good faith that MEI was willing to forego its mechanic's lien rights as to a balance of more than $200,000 in return for a payment of $31,938." Merchants, 314 Ill. App. 3d at 866. In addition, we noted that the affidavit submitted by MEI's project manager supported its contention that the waiver was not relied upon as a complete waiver of MEI's lien rights. Specifically, the affiant stated that the owners knew at the time the waiver was submitted that there remained a dispute as to MEI's invoices. Moreover, the affiant averred that the owners acknowledged in a September 1997 meeting, conducted one month after the waiver was executed, that money remained due and owing to MEI. We found this evidence comparable to that presented in Premier, stating: "Here, just as in Premier, the [project manager's] affidavit listed previous instances where, based on customary practice between the parties, MEI's waivers of lien to date were not viewed as accurately reflecting MEI's full, up-to-date subcontract price. However, unlike Premier, here there is no affidavit from defendants stating that they did in good faith rely upon MEI's waiver. If anything MEI's argument as to good-faith reliance is stronger here than was the plaintiff's argument in Premier, where the court still found there were triable issues as to reliance." Merchants, 314 Ill. App. 3d at 868. Nonetheless, we acknowledged that

48

because the issue of reliance was one of fact, and MEI had "at least raised a triable issue as to whether its lien waiver was relied upon as a full release," we declined to affirm the trial court's summary judgment order on the basis of MEI's lien waiver. Merchants, 314 Ill. App. 3d at 868.

Accordingly, based on our prior decisions in Premier and Merchants, we will review the extrinsic evidence relied upon by Reinke to oppose First Midwest's lien waiver defense. The extrinsic evidence that Reinke primarily relies upon to show lack of reliance is the deposition testimony of Pamela Hitzemann, a senior construction escrow officer at Ticor.

Hitzemann was deposed several times in this case. At her May 5, 2006, deposition, Hitzemann testified that the escrow agreement set forth the procedures Ticor followed in disbursing funds on the Montreville Project. The terms of the escrow agreement required Ticor, prior to disbursing funds, to receive various documents including sworn statements and waivers; however, she had no recollection of ever discussing waivers with CoVest. However, she acknowledged that Ticor disbursed funds to Zemon (a subcontractor that provided work on the Project but that is not a party to this appeal) without receiving waivers of any kind.

Thereafter, at her June 19, 2006, deposition, Hitzemann stated it would be "impossible" to know when Ticor received a lien waiver, because there was apparently no logging system in place, but that "[i]t would be [her] practice to have [the waivers] before [she] disbursed." She maintained that "you don't disburse funds unless you have a waiver."

Nonetheless, when asked about Reinke's waiver, Hitzemann did not know when the waiver was received, if she reviewed it, or if payment was disbursed in reliance on the waiver. Moreover, although Hitzemann submitted a declaration indicating that it was her practice to rely

on lien waivers, and that "Ticor relied on the receipt [of Reinke's lien waiver] in disbursing funds," she acknowledged at her deposition that this statement did not indicate that she personally relied on Reinke's waiver.

Based on Hitzemann's inability to recall specific details concerning its lien waiver, Reinke maintains that there was no reliance on its waiver. We disagree that Hitzemann's inability to recall the specific date that Reinke's waiver was received or the circumstances surrounding the payments issued to Reinke reveals a complete lack of evidence of reliance on its lien waiver, especially when Reinke does not deny executing the waiver or receiving payment. Although we are reluctant to accept First Midwest's argument that in all cases where a lien claimant submits a lien waiver and receives payment it is limited to disputing the nature, rather than the existence of, reliance on its lien waiver, we note that a lien claimant's argument concerning an absence of reliance is more likely to succeed when the party asserting the defense does not produce the lien waiver and no payment is made. See generally Luczak, 116 Ill. App. 3d at 298-99. In this case, however, because Hitzemann testified that disbursements were generally made only upon the receipt of a lien waiver and because Ticor had Reinke's waiver in its control and Reinke does not dispute that payment was received, we do not agree that Hitzemann's imprecise recall concerning the specifics of Reinke's waiver proves that there was no reliance.

Reinke, however, argues that even if reliance can be imputed to Ticor based on Hitzemann's testimony, First Midwest is not entitled to cite to Ticor's reliance to support its lien waiver defense because Ticor was not the agent of CoVest (First Midwest's predecessor-in interest). Although Reinke fails to provide any authority for this claim, we note that pursuant to

the escrow agreement that Ticor entered into with Covest, Ticor was required to obtain certain documentation prior to disbursing funds including: a sworn general contractor's statement, a sworn owner's affidavit, as well as "statements, waivers, affidavits, supporting waivers and release of lien (if necessary), satisfactory to Ticor." Accordingly, we do not believe that the lack of agency relationship is fatal to First Midwest's claim.

Alternatively, Reinke asserts that even if there was reliance on its February 14, 2003, lien waiver, its waiver was only relied upon as a partial waiver of its lien rights as to the consideration stated in the waiver rather than as complete waiver of its lien rights.

Initially, we note that Reinke's February 14, 2003, lien waiver, like the waiver at issue in Merchants, was accompanied by a sworn contractor's affidavit that revealed that a substantial balance remained due and owing to Reinke pursuant to the terms of its subcontract. Specifically, the affidavit identified Reinke's contract price as $152,070.86, and $74,901.86 as the balance due. Merchants, 314 Ill. App. 3d at 866 (questioning whether it was reasonable to infer that a subcontractor's waiver was relied upon as a complete waiver of its lien rights when the waiver was accompanied by an affidavit reflecting that a substantial balance was owed to the subcontractor). Unlike Merchants, however, Reinke's affidavit was actually entitled "Partial Waiver of Lien." Moreover, Reinke points out that when Hitzemann was questioned about Reinke's lien waiver at her July 19, 2006, deposition, she actually construed it as a "partial" waiver. Although First Midwest suggests that a waiver of lien to date can be partial depending upon when the waiver was submitted and whether a lien claimant continued working thereafter, Hitzemann's statement during her deposition that she looked to the contractor's affidavit, which

51

reflected amounts due and owing in making dispersals, does not support First Midwest's argument that this was Hitzemann's intended meaning. Indeed, the evidence presented by Reinke as to the nature of the reliance on its waiver is stronger than the evidence presented by the lien claimant in Merchants. Accordingly, based on the heading of the lien waiver ("Partial Waiver of Lien"), Hitzemann's testimony construing Reinke's waiver as a partial waiver of lien, and the fact that Reinke's waiver was accompanied by an affidavit reflecting that a substantial balance remained due and owing to Reinke, we do not find that there exists a genuine issue of material fact that Reinke's waiver was only relied upon as a partial waiver of its lien rights as to the consideration identified in the waiver. Accordingly, First Midwest is not entitled to a reversal of the trial court's summary judgment order based on its lien waiver defense.

First Midwest nonetheless asserts that the trial court erred in granting summary judgment in favor of Reinke because Reinke's lien claim, recorded on April 18, 2003, was overstated and constructively fraudulent. First Midwest notes that Reinke's claim recorded with the Cook County recorder of deeds asserted a lien for $150,054.86, which was the full contract price, even though Reinke had received two prior payments amounting to $51,104.98, both of which were received by March 20, 2003. Specifically, First Midwest points to the contractor's affidavit affixed to Reinke's February 14, 2003, lien waiver, which reflects that Reinke had received a prior payment of $24,819.15. First Midwest maintains that this prior payment, in addition to the prior payment of $26,195.83, that Richard Fischer, Reinke's former chief financial officer, acknowledged that Reinke received on March 20, 2003, but mistakenly omitted from its lien claim, resulted in an overstatement of Reinke's lien claim "by more than 51% [and] constitutes

constructive fraud."

Section 7 of the Act provides that an error or an overstatement in a lien claim will not defeat the claim unless the error or overstatement was made with an "intent to defraud." 770 ILCS 60/7 (West 2006). This section is "intended to protect an honest lien claimant who makes a mistake rather than a dishonest claimant who knowingly makes a false statement." Peter J. Hartmann Co., 353 Ill. App. 3d at 706. Where there is evidence that the lien claimant knowingly filed a lien claim that contained a "substantial overcharge," the claim will be defeated on the basis of constructive fraud. Peter J. Hartmann Co. v. Capitol Bank & Trust Co., 353 Ill. App. 3d 700, 706 (2004).

In this case, Reinke acknowledges that its lien claim was overstated by $26,195.83, because a March 20, 2003, payment was not accounted for in its lien claim. However, Reinke maintains that the affidavit of Richard Fischer, Reinke's former chief financial officer, establishes that Reinke did not act with the requisite intent to defraud when it recorded its lien waiver and, accordingly, did not engage in constructive fraud.

Fischer's affidavit describes the circumstances surrounding the preparation and recording of Reinke's lien claim. Specifically, Fischer averred that as of March 18, 2003, the date he requested the Contractor's Adjustment Company to prepare a mechanic's lien claim on Reinke's behalf, Reinke was owed $152,070.62 for the materials it provided on the Montreville Project. After making this request, Reinke received partial payments totaling $77,168.75, leaving a balance of $74,901.86 due to Reinke. The first partial payment, amounting to $26,195.83, was received on March 20, 2003; however, Fischer was unaware of Reinke's receipt of this payment when he

signed Reinke's lien claim on April 3, 2003. Fischer further stated that the remaining partial payments were received by Reinke after April 18, 2003, the date Reinke recorded its lien claim with the Cook County recorder of deeds, and that "[a]t no time was it [his] intention to overstate the amount of Reinke's lien claim."

Accordingly, Fischer's affidavit establishes that when he requested a lien claim to be prepared, Reinke was owed $152,070.62, and when the claim was recorded on April 18, 2003, Reinke had received a $26,195.83 payment, which the lien claim failed to reflect. However, due to the circumstances surrounding the preparation of Reinke's lien claim, Fischer was unaware of Reinke's receipt of this payment when he signed the lien claim.

First Midwest, however, citing Lohmann, maintains that "Illinois law does not permit Fisher to be as ignorant as he claims to have been." In Lohmann, a subcontractor that provided engineering services on three parcels of land pursuant to a single contract, recorded three separate mechanic's lien claims for $145,568, the full amount due for the work performed on all three of the properties, which resulted in a total lien claim that was triple the amount actually due. Lohmann, 260 Ill. App. 3d at 891-92. We inferred that the substantial overstatement was made with an intent to defraud based, in part, on the fact that the president of the subcontracting company signed three affidavits, one for each lien claim, that stated that the same total was due for each parcel. Lohmann, 260 Ill. App. 3d at 892-93. Specifically, we found "it is reasonable to infer that he knew that only $145,568 was due and owing, and yet he signed three separate affidavits verifying that the same amount was owed to the company from three different land owners." Lohmann, 260 Ill. App. 3d at 892.

54

In this case, although it is true that Fisher verified Reinke's lien claim that contained an overstatement, the timing of the payment and the procedure in which the lien claim was prepared makes it reasonable to infer that when Fisher verified Reinke's lien claim he was unaware of the overstatement. Indeed, Fischer's uncontradicted affidavit negates intent. Accordingly, unlike Lohmann, it is not reasonable to impute knowledge to Fisher based solely on his actions in verifying Reinke's lien claim.

However, First Midwest is correct that Fisher's affidavit fails to account for a $24,819.15 payment that the affidavit attached to Reinke's February 14, 2003, lien waiver shows that Reinke had received on or prior to February 14, 2003. Reinke responds that there is no evidence as to when the lien waiver with the accompanying affidavit was delivered and that Fisher's affidavit reciting the amount and date of prior payments is uncontradicted.

Although Reinke is correct that there is no evidence as to the date the waiver was delivered, it has failed to explain why the delivery date is relevant. The affidavit itself is dated February 14, 2003, and reflects that Reinke had received $24,819.15 prior to the payment requested, although the date of the prior payment is not specified. Thus, there is no dispute a $24,819.15 payment was received prior to April 18, 2003, the date on which Reinke recorded its lien claim and that this amount was not accounted for in the lien claim. Although Reinke is correct that Fisher's affidavit is uncontradicted and we must accept it as true, Fisher's affidavit never addresses the payment information identified in the affidavit accompanying Reinke's waiver.

We thus find that Reinke's claim is overstated by $24,819.15. There is no evidence, however, that the overstatement was made with an intent to defraud. Even under a constructive

55

fraud theory, a lien claim will not be invalidated simply because the claim contains an overstatement. Peter J. Hartmann Co., 353 Ill. App. 3d at 708. Rather, in most cases, "the intent to defraud [is] shown by executed documents that on their face overstate the amount *due in combination with some other evidence of record from which intent could be inferred*." (Emphasis added.) Peter J. Hartmann Co., 353 Ill. App. 3d at 708. In this case, aside from the lien claim itself, First Midwest points to no other evidence from which fraudulent intent can be inferred. Accordingly, we will not invalidate Reinke's lien claim on the basis of constructive fraud. We do, however, find that Reinke is only entitled to a lien claim valued at $50,082.71, not $74,901.86, the recovery permitted by the trial court.

Accordingly, the trial court's order granting summary judgment in favor of Reinke is affirmed as modified.

**INLAND**

We turn now to the claims that First Midwest asserts against Inland, the electrical subcontractor on the Project.

Inland entered into its subcontract with CSI on April 13, 2001, and after providing services in accordance with the terms of its subcontract, recorded a mechanic's lien claim for $661,427.60 with the Cook County recorder of deeds on June 2, 2003. Inland subsequently filed a counterclaim to foreclose its mechanic's lien in the circuit court on June 23, 2003. In its counterclaim, Inland alleged that it entered into a contract with CSI to provide electrical materials and labor on the Montreville Project on April 13, 2001, in exchange for payment of $1,307,000, and that at the request of CSI, Inland furnished additional labor and materials valued at $25,000.

56

The counterclaim asserted that Inland's last day of work on the Montreville Project was March 13, 2003, and that it was owed a balance of $661,427.60 for materials and labor that it provided on the Project. Inland's counterclaim also included a breach of contract claim against CSI and sought money damages from Northstar and Savannah.

Following the trial court's orders entering default judgment against Northstar, Savannah, and CSI, and finding that Inland's mechanic's lien had priority over First Midwest's mortgage lien, Inland filed a motion for summary judgment and turnover of funds. Inland maintained it was entitled to summary judgment in the amount of $661,427.60 plus statutory interest "as there is no dispute of fact over the allegations in Inland's Complaint and that Inland has a first priority lien on the property."

Inland's motion was supported by a number of exhibits including affidavits from Pasquale Selvaggio, Inland's vice president, and Ky Helgesen, its electrical superintendent, both of whom described the nature of the electrical services that Inland provided. In addition, Helgensen stated in his affidavit that "[a]ll of the work completed by Inland on the Project as of March 13, 2003 was done in a worklike manner," while Selvaggio confirmed that "[t]o date, there is due, unpaid and owing Inland a sum of $661,427.60."

First Midwest, in turn, filed a response to Inland's motion as well as a cross-motion for summary judgment. First Midwest maintained it was entitled to summary judgment against Inland because Inland failed to comply with discovery requests. Moreover, First Midwest asserted that Inland's claim was constructively fraudulent and barred by a lien waiver.

In support of its argument that Inland failed to comply with discovery requests, First

Midwest alleged that Inland only produced two weekly cost reports in response to First Midwest's discovery request even though the deposition testimony of Michael Harnett, Inland's former project manager, established that Inland had generated such reports on a weekly basis. Moreover, in support of its constructive fraud claim, First Midwest relied on an evaluation form that had been completed by Hartnett and alleged that Inland's mechanic's lien claim was overstated because the amounts indicated therein were substantially less than the amounts sought in Inland's final payment application. Finally, for the first time in the trial court, First Midwest asserted a lien waiver defense and argued that Inland partially waived its lien claim when it executed a January 17, 2003, "Waiver of Lien to Date" which provided in pertinent part:

> "[I]n consideration of *** $125,280.00 Dollars, and other goods and valuable considerations, the receipt whereof is hereby acknowledged, do(es) hereby waive and release any and all lien or claim of, or right to, lien, under the statutes of the State of Illinois relating to mechanics, liens, with respect to and on said above-described premises, and the improvements thereon, and the material, fixtures, apparatus or machinery furnished, and on the moneys, funds or other considerations due to or become due from the owner, on account or labor, services, material, fixtures, apparatus or machinery, furnished to this date by the undersigned for the above described premises."

Based on the waiver, First Midwest maintained that Inland waived its right to assert a lien for labor and materials provided prior to January 17, 2003, and was thus only entitled to recover for labor provided after the date of the waiver to March 13, 2003, Inland's completion date. Because First Midwest had not raised this defense in its answer, it sought to amend its answer to include a

lien waiver affirmative defense.

Inland filed a response, asserting that none of First Midwest's defenses precluded summary judgment in Inland's favor. Specifically, it rejected First Midwest's contention that it failed to respond to discovery requests based on Hartnett's testimony because Hartnett acknowledged that he was a former employee and had not seen internal "job cost detail" reports for quite some time and could not recall various details about the reports including the program or process by which such reports were generated. Moreover, Inland asserted that First Midwest's constructive fraud defense had no merit because the evaluation report First Midwest relied upon to assert this defense did not correlate with the amounts specified in Inland's payment application. Finally, in response to First Midwest's lien waiver defense, Inland objected to First Midwest's "attempt[] to assert a lien waiver defense for the first time in its reply to Inland's motion for summary judgment." Inland urged the court to deny First Midwest's request to file an amended answer to include its lien waiver affirmative defense, arguing that Inland would be prejudiced if the amendment was allowed because it had not attempted to procure discovery to rebut this defense. Moreover, Inland responded that First Midwest's lien waiver defense was without merit because "there was no reliance by any party on any lien waiver."

After reviewing the motions, the trial court denied First Midwest's motion for leave to amend its answer. Thereafter, the trial court granted Inland's motion for summary judgment and denied First Midwest's cross-motion, finding that Inland "is entitled to a valid and subsisting mechanics lien in the amount of $661,427.60 together with statutory interest at the rate of ten percent (10%) per annum from March 13, 2003, (Inland's last date of performance)." In so

holding, the trial court deemed First Midwest's lien waiver defense waived and found First Midwest's constructive fraud argument to be meritless.

On appeal, First Midwest disputes the trial court's findings. Specifically, First Midwest first asserts that the trial court erred in granting summary judgment in favor of Inland because Inland executed a valid, unambiguous lien waiver, dated January 17, 2003, that waived Inland's right to assert a lien and recover for labor and materials "furnished to [the] date" of the waiver. First Midwest acknowledges that it failed to assert this affirmative defense until it filed a response to Inland's motion for summary judgment and that the trial court denied its motion to amend its answer to include a lien waiver affirmative defense, but urges us to consider this defense on appeal because the trial court's denial of its motion to amend its answer was erroneous. Inland, in turn, responds that the trial court correctly found that First Midwest's motion to amend its answer was untimely and that First Midwest waived its lien waiver affirmative defense.

As a general rule, " 'in order to avoid surprise to the opposite party, an affirmative defense must be set out completely in a party's answer to a complaint and failure to do so results in waiver of the defense.' " Miller v. Lockport Realty Group, Inc., 377 Ill. App. 3d 369, 375 (2007), quoting Hanley v. City of Chicago, 343 Ill. App. 3d 49, 53-54 (2003). However, "an affirmative defense is not waived, despite the fact that it was not raised in an answer to a complaint, if the defense is subsequently raised without objection in a motion for summary judgment." Alexander v. Consumers Illinois Water Co., 358 Ill. App. 3d 774, 780 (2005).

In this case, Inland objected to First Midwest's lien waiver defense, filing a response to Inland's motion to amend its answer to include that defense. Specifically, Inland argued that it

would be prejudiced if First Midwest were permitted to amend its answer and proceed with its lien waiver affirmative defense because discovery was complete and Inland had not sought to elicit testimony from any witness, including Hajyousif, concerning the interpretation or enforceability of its lien waiver. Although we acknowledge that Inland attempted to respond to First Midwest's lien waiver affirmative defense pending the trial court's ruling on First Midwest's motion to amend, we agree that Inland would be prejudiced if First Midwest were permitted to assert a lien waiver defense at this stage of the litigation and find that the court did not err in denying First Midwest's motion to amend. See Medrano v. Production Engineering Co., 332 Ill. App. 3d 562, 572 (2002) (recognizing that late amendments to answers are generally impermissible if the opposing party would be prejudiced or surprised).

First Midwest nonetheless maintains Inland's failure to comply with its discovery requests should have precluded Inland from obtaining summary judgment. Specifically, First Midwest notes that it had sought discovery from Inland and submitted a request to produce pursuant to Supreme Court Rule 214 (166 Ill. 2d R. 214) in the trial court, requesting Inland to produce various documents related to its work on the Montreville Project, including documents reflecting cost analyses and estimates. Inland responded to the request and produced various documents along with an affidavit attesting to its compliance with Rule 214. First Midwest, however, asserts that Inland's production was incomplete. Specifically, First Midwest alleges that Inland only produced two job cost reports even though the testimony Michael Hartnett, Inland's former project manager, revealed that such reports were generated weekly. Accordingly, First Midwest maintains that "[a]t the very least, Inland's failure to produce these records should have precluded

Inland from prevailing on its summary judgment motion." Inland responds that this argument has no merit because First Midwest failed to file a Rule 191(b) (210 Ill. 2d R. 191(b)) affidavit in the trial court.

As a rule, a party cannot argue on appeal that a summary judgment order must be reversed because it required additional discovery if it failed to request additional discovery and attach a Rule 191(b) affidavit to its summary judgment pleadings. See, e.g., Intercontinental Parts., 260 Ill. App. 3d at 1090-91 (rejecting the appellant's argument that summary judgment was improper due to the appellee's failure to produce documents because the appellant never filed a motion to compel or a Rule 191(b) affidavit reasserting its discovery need to its summary judgment response). In this case, First Midwest never filed a motion to compel the production of documents or a Rule 191(b) affidavit. Accordingly, First Midwest's claim that summary judgment must be reversed based on Inland's failure to comply with its discovery request is without merit. Intercontinental Parts, 260 Ill. App. 3d at 1090-91.

First Midwest next asserts that Inland's lien claim is constructively fraudulent because the amount identified in Inland's mechanic's lien claim greatly exceeds the cost estimates listed in an internal evaluation form that was completed by Inland's project manager near the time of Inland's completion date.

Section 7 of the Act provides that an error pertaining to the amount asserted in a lien claim does not defeat the claim unless the error was made "with an intent to defraud." 770 ILCS 60/7 (West 2006). Specifically, this section provides: "No such lien shall be defeated to the proper amount thereof because of an error or overcharging on the part of any person claiming a

lien therefor under this Act, unless it shall be shown that such an error or overcharge is made with intent to defraud." 770 ILCS 60/7 (West 2006). Intent to defraud may inferred from documents containing overstated lien amounts combined with additional evidence. Peter J. Hartmann Co., 353 Ill. App. 3d at 706. This section is intended to protect "an honest claimant, who mistakenly files an erroneous lien, rather than a [dishonest] claimant who knowingly files a false statement." Lohman, 260 Ill. App. 3d at 891, citing Christian v. Allee, 104 Ill. App. 177, 188 (1902); see also Peter J. Hartmann Co., 353 Ill. App. 3d at 706. When a lien claimant knowingly records a lien claim that contains a "substantial" overcharge, his lien claim may be defeated on the basis of constructive fraud. Peter J. Hartmann Co., 353 Ill. App. 3d at 706.

In this case, First Midwest claims that Inland's lien is overstated and constructively fraudulent based on a comparison of various documents. First Midwest first points to Inland's June 2, 2003, lien claim, which reveals that Inland's subcontract was valued at $1,307,000 and that Inland provided additional labor and materials valued at $25,000, increasing the total contract price to $1,332,000. According to the lien claim, Inland completed work amounting to $1,061.477.60 by March 13, 2003. Inland's claim acknowledged $400,050 in credits, and asserted a lien for $661,427.60. These numbers match the values in Inland's "final" application for payment, dated March 27, 2003, for work provided up to March 31, 2003. Dividing the value assigned to the work completed ($1,061.477.60) into the total contract price amount ($1,332,000) First Midwest asserts that these documents reveal that Inland completed 79% of the work required by its subcontract.

First Midwest, however, contrasts the values in these documents with the values in an

internal evaluation form completed by Mike Hartnett, Inland's former project manager, on March 14, 2003, and argues that based on its interpretation of this document, Inland's lien is substantially overstated. Specifically, First Midwest asserts that the internal evaluation form reflects that as of March 14, 2003, Inland had provided work at an estimated cost of $735,099, and that the estimated cost to Inland to complete the project was $397,262. Adding these two numbers, First Midwest claims that Harnett's analysis showed a total anticipated cost of $1,132,361. Dividing the estimated costs provided ($735,099) into the estimated total cost ($1,132,361), First Midwest argues that Inland completed only 64.9% of its work, not 79%. Accordingly, after accounting for credits, First Midwest maintains that Inland's maximum lien claim is $464,418, not $661,427.60, the amount actually asserted in Inland's lien claim. Based on its analysis of this document, First Midwest claims that Inland's lien claim is overstated and constructively fraudulent.

We disagree that First Midwest's analysis of this document supports its constructive fraud argument. Notably, Hartnett testified at his deposition that this document was an internal document that contained estimates, which Inland used to assess its expenditures and profits. He further testified that the payment applications First Midwest seeks to compare the internal estimate form to differed from those internal forms. Specifically, Hartnett explained that there is no direct correlation between the numbers in the internal evaluation form with respect to the percentage to complete and the contract balance. Moreover, when asked about Inland's final payment application, Hartnett confirmed that Inland was owed $661,428. Accordingly, we do not find that the evaluation report creates a genuine issue of material fact that Inland's claim is overstated. Because there is no overstatement, we do not find that Inland is guilty of constructive

64

1-06-3702
fraud.

For the foregoing reasons, we affirm the trial court's order granting summary judgment in favor of Inland.

**JUST RITE**

We now address the arguments that First Midwest asserts against Just Rite, another second-tier subcontractor that provided materials and services on the Montreville Project. Like Reinke, Just Rite commenced work on the Project after it entered into a contract with Chicago Drywall, the subcontractor that had been retained by CSI. Just Rite's subcontract was formed on June 26, 2002, and called for Just Rite to furnish labor and materials to complete the installation of the acoustical ceilings in the Project.

After performing pursuant to that agreement, Just Rite recorded a mechanic's lien claim with the Cook County recorder of deeds on April 22, 2003, asserting a lien for $139,627.50. Just Rite subsequently filed a counterclaim seeking to foreclose its lien in the circuit court on December 5, 2003. In its counterclaim, Just Rite alleged that it entered into a contract with Chicago Drywall to furnish labor and materials to install acoustic ceilings in the Montreville Project in exchange for payment totaling $160,000. Just Rite further alleged that it had provided the labor and materials called for by the contract as well as additional labor and labor and materials totaling $5,181. After acknowledging payment of $36,540, Just Rite's counterclaim alleged that there remained an outstanding balance of $128,641.

Thereafter, First Midwest filed a motion for summary judgment in the trial court. In its motion, First Midwest asserted that Just Rite had waived its right to assert a lien claim when it

executed a "Waiver of Lien to Date" on April 30, 2003, which provided:

> "The undersigned for and in consideration of * * * 36,540.00 Dollars, and other good and valuable consideration, the receipt whereof is hereby acknowledged, do(es) hereby waive and release any and all lien or claim of, or right to, lien, under the statutes of the State of Illinois, relating to mechanics' liens, with respect to and on said above-referenced premises and the improvements thereon, and on the material, fixtures, apparatus, or machinery furnished, and on the moneys, funds, or other considerations due or to become due from owner, on account of labor services, material, fixtures, apparatus or machinery furnished to this date by the undersigned for the above-referenced premises."

Because Just Rite identified March 26, 2003, as its completion date, First Midwest maintained that the Just Rite's waiver of lien to date resulted in a complete waiver of Just Rite's lien rights.

Just Rite filed a response to First Midwest's motion as well as its own cross-motion for summary judgment. In its response, Just Rite maintained that First Midwest's lien waiver defense had no merit because "[t]here is no evidence of any reliance on Just Rite's Waiver of Lien to Date and, therefore, the Waiver of Lien to Date is unenforceable." In support of its argument that there was no reliance, Just Rite pointed to the deposition testimony of Pamela Hitzemann, Ticor's senior construction escrow agent. At her deposition, Hitzemann was unable to provide details concerning the date on which Ticor received Just Rite's waiver and did not recall whether she had personally reviewed the waiver. Just Rite also asserted that it was entitled to summary judgment because there was no genuine issue of material fact that Just Rite performed lienable work pursuant to its subcontract and that it was owed $128,641. Just Rite supported its motion for

summary judgment with various exhibits, including an affidavit completed by Randy Benner, its project manager. In his affidavit, Benner provided details about Just Rite's subcontract, job performance, completion dates, prior payments, and identified $128,641 as the amount that Just Rite was owed.

Thereafter, First Midwest filed a response opposing Just Rite's summary judgment motion. In its response, First Midwest disputed Just Rite's characterization of Pamela Hitzemann's testimony and maintained that the declaration that she completed, in which she stated that "[i]t was my practice to require Waivers of Lien such as [that submitted by Just Rite] before disbursing checks. Accordingly Ticor relied on its receipt of [those] documents in disbursing funds" was evidence that there was reliance on Just Rite's April 30, 2003, lien waiver. Alternatively, First Midwest argued that Just Rite was not entitled to summary judgement because its claim was constructively fraudulent. In support of its claim, First Midwest pointed to a production report allegedly completed by Just Rite that contained various headings, including "date," "men on job," "straight time hours," "overtime hours" and "double time hours." Based on its interpretation of the production report, First Midwest asserted that as of the completion date identified in Just Rite's lien claim, Just Rite had only completed two-thirds of the work called for in its contract. Accordingly, because Just Rite had asserted a lien for the entire contract price, First Midwest alleged that Just Rite had engaged in constructive fraud.

Just Rite filed its own response objecting to First Midwest's use of Hitzemann's declaration. Specifically, Just Rite argued that Hitzemann's declaration was entitled to no weight because she acknowledged at her July 19, 2006, deposition that when she stated in her declaration

that Ticor relied on Just Rite's lien waiver in disbursing funds, she did not mean that she personally relied on the document. Just Rite also objected to First Midwest's use of the production report to substantiate its constructive fraud defense, noting that First Rite had never initiated discovery against Just Rite and that First Midwest never identified, explained, or provided a proper foundation for the report. Accordingly, Just Rite argued that First Midwest's constructive fraud argument had no merit.

After reviewing the relevant pleadings, the trial court granted Just Rite's cross-motion for summary judgment and denied First Midwest's motion for summary judgment, finding that "Just Rite is entitled to and awarded a valid and subsisting mechanics lien in the amount of $103,087.50 together with statutory interest at the rate of ten percent (10%) per annum from April 22, 2003 (the date on which Just Rite recorded its mechanics lien claim with the Cook County Recorder)." In so holding, the trial court rejected First Midwest's lien waiver defense, finding that Hitzemann's declaration was entitled to no weight because neither she nor Ticor had a specific practice with regard to the review of lien waivers, and accordingly, there was no reliance on Just Rite's April 30, 2003, lien waiver. The trial court also found that First Midwest's constructive fraud argument had no merit because First Midwest "provided no foundation for the use of" the production report on which its argument was premised.

On appeal, First Midwest disputes these findings. Initially, First Midwest asserts that the trial court erred in granting summary judgment to Just Rite because Just Rite completely waived its lien rights when it executed a "waiver of lien to date" on April 30, 2003.

Just Rite raises the same arguments as Reinke regarding the burden of proof and the lack

of evidence of reliance based on Hitzemann's deposition testimony. As we have already addressed and rejected these claims in detail above, we need not do so here. However, we will address Just Rite's alternative argument that its waiver was only relied upon as a partial waiver of lien as to the sum stated in the waiver as opposed to a complete waiver of all of its lien rights as to the date of the waiver.

Initially, we note that like Reinke's waiver as well as the waiver at issue in Merchants, Just Rite's waiver was accompanied by a sworn contractor's affidavit that reflected that a substantial contract balance remained due and owing to Just Rite. Merchants, 314 Ill. App. 3d at 866 (questioning whether it is reasonable to infer that the subcontractor's lien waiver was believed to be a full waiver of the subcontractor's lien rights when the affidavit affixed to the waiver reflected that a substantial balance remained due). Specifically, the affidavit identified $160,877.50 as Just Rite's total contract price, no prior payments, a current payment request for $36,540, and the balance due as $124,337.50. Although we found that there was a genuine issue of material fact as to the nature of the reliance on the lien waiver in Merchants despite the existence of the contractor's affidavit, here there is affirmative evidence that the recipient of the waiver did not entertain a good-faith belief that the lien claimant was willing to forego its right to assert a lien to recover a substantial payment in exchange for a relatively small payment. Notably, at Hitzemann's July 19, 2006, deposition, Just Rite's counsel questioned Hitzemann about Just Rite's lien waiver, asking: "Do you think this document was intended to be a partial waiver of lien?," to which Hitzemann responded, "Yes." Based on the foregoing evidence, we do not find that there is a genuine issue of material fact that Just Rite's waiver was only relied upon as a

partial waiver of its lien rights as to the consideration reflected in the waiver. First Midwest is thus not entitled to a reversal of the trial court's summary judgment order on the basis of its lien waiver defense.

First Midwest nonetheless asserts that the trial court erred in granting summary judgment in favor of Just Rite because Just Rite failed to provide sufficient evidence of its completion date and thus failed to perfect its lien claim. First Midwest does not dispute that Just Rite identified March 26, 2003, as its completion date in its lien claim or that Randy Benner, Just Rite's project manager, confirmed in his affidavit that March 26, 2003, was Just Rite's completion date. Rather, First Midwest maintains that Just Rite failed to provide sufficient evidence to support its March 26, 2003, completion date because Benner's affidavit failed to comport with Rule 191(a) (210 Ill. 2d R. 191(a)) because it did not identify facts with particularity. Specifically, First Midwest asserts that Benner's affidavit failed to provide details concerning the work performed on March 26, 2003, or identify the employees who performed labor on that date. Just Rite responds that First Midwest has waived this argument because it failed to raise this issue in the trial court and never attempted to strike Benner's affidavit for any alleged Rule 191(a) deficiencies.

Rule 191(a) sets forth the requirements for affidavits submitted in favor of, or in opposition to, motions for summary judgment. 210 Ill. 2d R. 191(a). In pertinent part, this rule requires that affidavits "be made on the personal knowledge of the affiant[]" and "set forth with particularity the facts upon which the claim, counterclaim, or defense is based." 210 Ill. 2d R. 191(a). Affidavits submitted with summary judgment pleadings must strictly comply with the requirements of Rule 191(a). Robidoux v. Oliphant, 201 Ill. 2d 324, 336 (2002). Accordingly,

70

affidavits that are conclusory and fail to state facts with particularity do not strictly comply with Rule 191(a) and may be stricken. See Robidoux, 201 Ill. 2d at 335; Steiner Electric Co. v. NuLine Technologies, Inc., 364 Ill. App. 3d 876, 881 (2006). However, it is the burden of the party objecting to the sufficiency of a Rule 191(a) affidavit to challenge the affidavit in the trial court and obtain a ruling thereon. See American Country Insurance Co. v. Mahoney, 203 Ill. App. 3d 453, 462 (1990), citing Oak Trust & Savings Bank v. Annerino, 64 Ill. App. 3d 1030, 1032 (1978). Failure to do so results in waiver. Financial Freedom v. Kirgis, 377 Ill. App. 3d 107, 133 (2007), quoting Arnett v. Snyder, 331 Ill. App. 3d 518, 523 (2001) (" 'In Illinois *** the sufficiency of affidavits cannot be tested for the first time on appeal where no objection was made by motion to strike, or otherwise, in the trial court' "); see also Lang v. Silva, 306 Ill. App. 3d 960, 971 (1999).

In this case, it was First Midwest's burden to assert its objection regarding the sufficiency of Benner's affidavit in the trial court and obtain a ruling thereon. Because First Midwest failed to do so, it may not test the sufficiency of Benner's affidavit for the first time on appeal. See Financial Freedom, 377 Ill. App. 3d at 133; Lang, 306 Ill. App. 3d at 971; American Country Insurance, 203 Ill. App. 3d at 462. Moreover, because First Midwest failed to contradict Benner's affidavit with a counteraffidavit or other admissible evidence, Benner's statements concerning Just Rite's completion date must be taken as true. F/H Paschen, 372 Ill. App. 3d at 93; Financial Freedom, 377 Ill. App. 3d at 134. Accordingly, we find that First Midwest has failed to raise a genuine issue of material fact as to Just Rite's completion date.

Finally, First Midwest asserts that the trial court erred in granting summary judgment in

71

favor of Just Rite because Just Rite's claim is overstated and constructively fraudulent. First Midwest's constructive fraud claim is premised upon the fact that Just Rite's lien claim identified March 26, 2003, as its completion date and asserted entitlement to a lien amounting to $139,627.50, a computation that reflected Just Rite's full contract price ($160,877.50) minus $21,250 in credits. First Midwest, however, maintains that a production report allegedly completed by Just Rite shows that as of "March 26, 2003, the completion date alleged in its lien, only two-thirds of the work had been performed–only 1,498 out of 2,187.5 hours that Just Rite alleges that it ultimately worked." Accordingly, First Midwest asserts that Just Rite's claim is overstated by more than "30%." Just Rite, in turn, asserts that First Midwest never sought to obtain discovery from it in the trial court and failed to properly identify or provide a proper foundation for the report on which its constructive fraud argument is based. Accordingly, Just Rite maintains that the trial court correctly found First Midwest's constructive fraud argument to be without merit.

In ruling on a motion for summary judgment, a court can only consider evidence that would be admissible at trial and "[b]asic rules of evidence require that a party must lay the proper foundation for the introduction of a document into evidence" if it wishes to rely on the document in summary judgment proceedings. Financial Freedom, 377 Ill. App. 3d at 134. To lay a proper foundation for a document, a party must present evidence that shows that the document is what it purports to be. Financial Freedom, 377 Ill. App. 3d at 134; Greaney v. Industrial Comm'n, 358 Ill. App. 3d 1002, 1011 (2005). The party can authenticate the document by providing an affidavit or by presenting " 'testimony of a witness who has sufficient personal knowledge' " of

72

the document. <u>CCP Ltd. Partnership v. First Source Financial, Inc.</u>, 368 Ill. App. 3d 476, 484 (2006), quoting <u>Kimble v. Earle M. Jorgenson Co.</u>, 358 Ill. App. 3d 400, 415 (2005).

In this case, First Midwest failed to provide any evidence to authenticate the report. Because First Midwest failed to present the necessary evidence to authenticate the document, it has no evidence to support its constructive fraud affirmative defense, and thus we find this defense to be without merit. See, <u>e.g.</u>, <u>CCP Ltd. Partnership</u>, 358 Ill. App. 3d at 484-85 (finding that the defendant's affirmative defense had no merit because it failed to properly authenticate the documents on which its defense relied).

For the foregoing reasons, we affirm the trial court's order granting summary judgment in favor of Just Rite.

**ALL**

We now address the arguments that First Midwest asserts against ALL, the masonry subcontractor on the Montreville Project.

ALL entered into a subcontract with CSI on June 7, 2001. After performing pursuant to the terms of its subcontract, ALL recorded its lien claim with the Cook County recorder of deeds on August 15, 2003, asserting a lien for $1,128,611.54. Thereafter, on September 29, 2003, ALL filed a counterclaim to foreclose its lien in the circuit court. ALL's counterclaim alleged that it entered into a contract with CSI to provide masonry materials and labor on the Montreville Project in exchange for payment of $2,554,280. Thereafter, CSI directed ALL to provide additional labor and materials on the Project amounting to $60,291.54. ALL's counterclaim alleged that its final day of work on the Project was May 31, 2003, and that the total value of the

labor and materials provided on the Project was $2,614,571.54. After accounting for payments and credits, ALL's counterclaim sought to foreclose a lien totaling $1,128,611.54. ALL's counterclaim also included a breach of contract claim against CSI.

Thereafter, the parties filed cross-motions for summary judgment. First Midwest asserted that it was entitled to summary judgment because ALL executed a "Waiver of Lien to Date" on April 30, 2003, which provided in pertinent part:

"The undersigned, for and in consideration of Two Hundred Thousand and 00/100 ($200,000) Dollars, and other good and valuable consideration, the receipt of whereof is hereby acknowledged, do(es) hereby waive and release any and all lien or claim of, or right to, lien, under the Statutes of Illinois, relating to mechanics' liens, with respect to and on said above-described premises, and the improvements thereon, and on the material, fixtures, apparatus or machinery furnished, and on the moneys, fund or other consideration due to become due from the owner, on account of labor services, material, fixtures, apparatus or machinery, furnished to this date by the undersigned for the above-described premises."

Based on the language in the waiver, First Midwest argued that ALL waived its right to assert a lien for work performed prior to April 30, 2003. First Midwest further argued that this resulted in a complete waiver of ALL's lien rights because a payment application submitted by ALL revealed that all of the work for which it sought to assert a lien had been completed by April 30, 2003. Though First Midwest disputed that it bore the burden to establish innocent reliance on ALL's lien waiver, it nonetheless asserted that the declaration submitted by Pamela Hitzemann, a senior

construction escrow agent at Ticor, established reliance. Specifically, First Midwest noted that Hitzemann stated: "It was my practice to review Waivers of Lien * * * before disbursing checks. Accordingly Ticor relied on its receipt of [ALL's lien waiver] in disbursing funds." In addition, First Midwest maintained that Luis Puig, ALL's vice president, acknowledged that there was reliance on ALL's waiver in his deposition when he testified that ALL received the $200,000 payment after submitting its lien waiver. Alternatively, First Midwest argued it was entitled to summary judgment because ALL failed to perfect its lien claim when it recorded its claim and sent notice of its claim on the same date and thus failed to abide by the mandatory 10-day period between providing notice and filing a lien claim allegedly required by section 28 of the Act.

ALL filed a response to First Midwest's motion as well as its own motion for summary judgment. In its motion, ALL argued it was entitled to summary judgment against First Midwest because there was no genuine issue of material fact that it had fulfilled its contractual obligations, properly recorded and perfected its lien under the Act, or that its lien claim had priority over First Midwest's mortgage lien. Accordingly, ALL maintained it was entitled to judgment in the amount of $1,128,611.54. ALL supported its motion for summary judgment with various documents including an affidavit from Luis Puig, ALL's vice president. In his affidavit, Puig confirmed the value of the work that ALL provided, stated that ALL's services were performed in a workmanlike manner, and identified May 31, 2003, as ALL's completion date.

Moreover, ALL asserted it was entitled to summary judgment notwithstanding First Midwest's affirmative defenses because the defenses were without merit. With respect to First Midwest's lien waiver defense, ALL argued it was without merit because First Midwest failed to

prove that there was good-faith reliance on its lien waiver. Specifically, ALL argued that neither the deposition testimony of Pamela Hitzemann nor her declaration provided evidence of reliance due to the fact that she was unable to provide specific details concerning Ticor's receipt and reliance on ALL's lien waiver. Alternatively, ALL argued that if there was any reliance on its lien waiver, there was no genuine issue of material fact that its waiver was only relied upon as a partial waiver of its lien rights as to the consideration identified in the waiver, rather than as a complete waiver of its lien rights as to the date of the waiver. ALL asserted that Puig's uncontradicted supplemental affidavit as well as his deposition testimony showed that the waiver was only intended as a partial waiver of ALL's lien rights and that its waiver was interpreted as such.

After reviewing the pleadings submitted by both parties, the trial court granted ALL's motion for summary judgment and denied First Midwest's motion, finding that: "ALL is entitled to and awarded a valid and subsisting mechanic's lien in the amount of $1,128,611.54 together with statutory interest at the rate of ten percent (10%) per annum from May 31, 2003 (the last date of work at the Premises.)" In so holding, the trial court deemed First Midwest's lien waiver defense meritless, finding that "[t]he Declaration of Pamela Hitzemann is entitled to no weight. Neither Ticor nor Pamela J. Hitzemann had any particular practice with regard to their review and of reliance upon lien waivers in this case. *** There was no reliance by First Midwest or its predecessor-in-interest on ALL's Waiver of Lien to Date dated April 30, 2003 as a date waiver rather than an amount waiver." The court also found that ALL "took all necessary steps to properly perfect its mechanic's lien claim."

On appeal, First Midwest contests these findings. Initially, First Midwest asserts that the

trial court erred in awarding summary judgment in favor of ALL because ALL fully waived its lien

rights when it executed its April 30, 2003, waiver of lien to date.

ALL raises the same arguments as Reinke and Just Rite regarding the burden of proof and

the lack of evidence of reliance on its lien waiver based on Hitzemann's deposition testimony. As

we have already addressed and rejected these claims in detail, we need not do so again here. We

will, however, address ALL's alternative argument that the uncontradicted evidence reveals that

its waiver was only relied upon as a partial waiver of its lien rights as to the consideration stated

in the waiver rather than as a complete waiver of its lien rights as to the date of the waiver. In

doing so, we will review the extrinsic evidence relied upon by ALL to show partial reliance on its

waiver. Merchants, 314 Ill. App. 3d at 863; Premier, 132 Ill. App. 3d at 492.

Initially, we note that like the waiver at issue in Merchants, ALL's April 30, 2003, waiver

of lien to date was also accompanied by a contractor's affidavit. Merchants, 314 Ill. App. 3d at

866. Unlike the waiver in Merchants, however, ALL's affidavit does not specify the value of the

remaining contract balance. Rather, it indicates that ALL's contract price and balance were

"open" and identifies prior payments amounting to $1,185,959.50.

ALL's vice president, however, provided testimony that ALL's lien waiver was only

intended and only relied upon as a partial waiver of ALL's lien rights as to the consideration

stated in the waiver. Specifically, at Puig's deposition, the following exchange took place:

> "Q. Did you ever perceive in signing a waiver to date you were risking that you
>
> were waiving something that you hadn't collected yet and might never collect?
>
> A. No, I never did.

Q. Is it your understanding that you are still owed money by the owners?

A. It's my understanding that I'm only waiving the amount that I put on the waiver of lien, only waiving the amount that I've been paid ***

Q. To that date?

A. To the amounts on the waiver.

Q. That's not what the document says, is it?

A. You know, that's the way I read it though. I don't know if that's the way it reads. Amount due."

Puig also submitted an affidavit in this case in which he explained that based upon the industry practice as well as the practice on the Montreville Project, the waivers were never intended and never relied upon to effectuate a complete waiver of ALL's lien rights. Specifically, Puig averred:

"I dated ALL's Waivers of Lien to Date and attendant Contractor's Affidavits on the date I signed such documents, without intending to waive the whole of ALL"s lien rights to that date, but only to the extent of the payment received as reflected in the waiver itself. *** Based on industry custom and practice, as well as established custom and practice for the Montreville Project in particular, Construction Services through its agent Bassam [Hajyousif] knew that the Waivers of Lien to Date submitted by ALL were intended only to waive ALL's lien to the extent of the funds for which they were exchanged and did not in any way constitute a complete waiver of the whole of ALL's lien claim through the date on which they were signed."

First Midwest has not provided any contrary affidavit disputing Puig's contention that, based on industry practice as well as the practice of the parties, ALL's waiver of lien to date was not intended and not interpreted as a complete waiver of ALL's lien rights, and accordingly, we must accept Puig's statements as true. See Central Illinois Light Co., 213 Ill. 2d at 170-71; F.H. Paschen, 372 Ill. App. 3d at 93.

Moreover, the interpretation Puig ascribes to ALL's lien waiver is corroborated by the testimony of Pamela Hitzeman, the escrow agent at Ticor who was primarily responsible for receiving and reviewing the lien waivers submitted by various subcontractors who provided work on the Montreville Project. Although Hitzemann was not asked to interpret ALL's lien waiver specifically, when she was asked to construe lien waivers that contained identical language to the waiver submitted by ALL, she construed them as "partial" waivers.

Based on the deposition testimony provided by Puig and Hitzemann, as well as Puig's uncontradicted affidavit, we do not find that there is a genuine issue of material fact that ALL's lien waiver was only relied upon as a partial waiver of its lien rights as to the consideration identified in the waiver.

Next, First Midwest contends that the trial court erred in awarding summary judgment in favor of ALL because ALL failed to properly perfect its lien claim. Specifically, First Midwest asserts that ALL's section 24 notice was untimely because it was not provided within 90 days of ALL's completion date. 770 ILCS 60/24 (West 2006).

To perfect a mechanic's lien claim, section 24 of the Act requires a subcontractor to "file a notice of lien claim within 90 days after 'completion' of his work in order for the claim to be

enforceable." Merchants, 314 Ill. App. 3d at 856; see also Cyclonaire Corp. v. ISG Riverdale, Inc., 378 Ill. App. 3d 554, 560 (2007). Compliance with section 24's notice requirement is a "condition precedent to the cause of action." Caruso v. Kafka, 265 Ill. App. 3d 310, 313 (1994); see also Seasons-4, Inc. v. Hertz Corp., 338 Ill. App. 3d 565, 570 (2003). Section 24 specifically provides:

> "Sub-contractors, or part[ies] furnishing labor or materials, may at any time after making his or her contract with the contractor, and shall within 90 days after the completion thereof, or, if extra or additional work or material is delivered thereafter, within 90 days after the date of completion of such extra or additional work or final delivery of such extra or additional material, cause a written notice of his or her claim and the amount due or to become due thereunder, to be sent by registered or certified mail, with return receipt requested, and delivery limited to addressee only, to or personally served on the owner of record or his agent or architect, or the superintendent having charge of the building or improvement and to the lending agency, if known." 770 ILCS 60/24 (West 2006).

The term "completion" as used in the Act " ' "does not refer to completion of the contract. It means completion of the work for which a contractor seeks to enforce his lien [Citation.]" [Citation.]' " Merchants, 314 Ill. App. 3d at 58, quoting D.M. Foley Co. v. North West Federal Savings & Loan Ass'n, 122 Ill. App. 3d 411, 414 (1984) (discussing the term "completion" in the context of section 7 of the Act.); see also Mutual Services, Inc. v. Ballantrae Development Co., 159 Ill. App. 3d 549, 553 (1987).

The record reveals that ALL recorded its mechanic's lien claim pursuant to section 7 of

1-06-3702

the Act (770 ILCS 60/7 (West 2006)) on August 15, 2003, and provided notice of its lien claim pursuant to section 24 of the Act (770 ILCS 60/24 (West 2006)) on the same date. The record further reveals that ALL filed its complaint to foreclose its mechanic's lien in the trial court on September 29, 2003. The documents each identify May 31, 2003, as ALL's last date of work on the Montreville Project. First Midwest, however, cites to a payment application dated July 21, 2003, submitted by ALL for the "period to" April 30, 2003. The payment application identifies the original contract price as $2,554,280, a contract change amounting to $60,291.54, and the total work completed as $2,614,571.54. After accounting for previous payments totaling $1,485,960, ALL's payment application sought $1,128,611.04. This is the same amount identified in ALL's lien claim, which was recorded and served on August 15, 2003. Based on the numerical amounts indicated in ALL's payment application and lien claim, First Midwest asserts that ALL's completion date was necessarily April 30, 2003. Accordingly, to perfect its lien, First Midwest asserts that ALL was required to serve notice no later than July 29, 2003, and thus its August 15, 2003, notice was untimely.

ALL, however, asserts that a site log completed by AMEC, the project manager, on May 27, 2003, shows that ALL was at the jobsite and performed work on that date. Specifically the log states: "ALL MSNRY (6) Hang Stone Soffits Over Overhd Doors & Ren Stone Piers, De-Mobilize & Load Out Equipt; Masonry Complete!" Accordingly, ALL asserts that there is no genuine issue of material fact that ALL worked on the Project at least until May 27, 2003, and that even if May 27, 2003, and not May 31, 2003, was its true completion date, its section 24 notice served on August 15, 2003, was timely because it was provided within 90 days of its completion

81

1-06-3702
date.

First Midwest, however, relying on our prior decision in Merchants, asserts that even if work was performed on May 27, 2003, the July 21, 2003, payment application shows that the work was not included in the work for which ALL asserted a lien, and accordingly April 30, 2003, the period covered by the payment application, was necessarily ALL's true completion date. In Merchants, a subcontractor identified August 29, 1997, as its completion date, and filed its section 24 notice of its mechanic's lien on November 6, 1997. A third-party purchaser, however, maintained that an invoice, dated June 3, 1997, labeled "final billing," which sought payment for an amount substantially equal to the amount sought in the lien claim, showed that even if work was performed on August 29, 1997, it was not included in the work for which the subcontractor asserted a lien and, accordingly, the subcontractor's completion date was necessarily June 3, 1997, and thus its notice was untimely. In support of its completion date, the subcontractor produced a work ticket dated August 29, 1997, which reflected that two workers spent eight hours at the jobsite on that date, as well as an affidavit completed by its project manager who averred that it was standard practice for the subcontractor to submit final bills before work on the project was completed and that when it submitted the final bill on June 3, 1997, it still had to install eight ceiling grids to complete its contractual obligations and that the installation took place on August 29, 1997. The trial court found the subcontractor's evidence unpersuasive and awarded summary judgment in favor of the third-party purchaser, finding that the subcontractor's notice was untimely. Merchants, 314 Ill. App. 3d at 852-55.

On appeal, we reversed, finding that based on the work ticket and project manager's

82

affidavit, the subcontractor had raised triable issues as to its completion date. Specifically, we found that it was "reasonable" to infer, based on the project manager's affidavit stating that the subcontractor submitted final bills before work on the project was completed "that the ceiling grill work was included in the June 3, 1997, invoice." Merchants, 314 Ill. App. 3d at 857-58.

Here, First Midwest asserts that it is entitled to summary judgment because, unlike the subcontractor in Merchants, ALL has not produced an affidavit indicating it was common practice to submit payment applications for work yet to be performed. Initially, we note that although a final invoice may be used to establish a completion date (see Cycolonaire Corp., 378 Ill. App. 3d at 561, citing Caruso, 265 Ill. App. 3d at 314), the July 21, 2003, payment application that First Midwest seeks to utilize to dispute ALL's completion date is not marked final. Notably, the record reveals that ALL's "final" payment application was submitted on June 30, 2003, for a "period to" that date and identified the total value of the work completed as $2,614,571.54, the same amount identified in the latter July 21, 2003, payment application as well as in its lien claim.

Reviewing ALL's final payment application as well as Luis Puig's uncontradicted affidavit identifying May 31, 2003, as ALL's completion date, as well as AMEC's site log, we do not find that First Midwest has raised a genuine issue of material fact that ALL's true completion date was April 30, 2003, and that ALL's notice was untimely.

As an alternative argument, First Midwest maintains that even if ALL's section 24 notice was timely, ALL nonetheless still failed to perfect its lien claim because it recorded and provided notice of its claim on the same date and thus failed to abide by the timing requirements set forth in section 28 of the Act (770 ILCS 60/28 (West 2006)).

Section 28 provides in pertinent part:

"If any money due to the laborers, materialmen, or sub-contractors be not paid within 10 days after his notice is served as provided in sections 5, 24, 25, and 27, then such person may file a claim for lien or file a complaint and enforce such lien within the same limits as to time and in such other manner as hereinbefore provided for the contractor in section 7 and sections 9 to 20 inclusive, of this Act, or he may sue the owner and contractor jointly for the amount due in the circuit court, and a personal judgment may be rendered therein, as in other cases." 770 ILCS 60/28 (West 2006).

Relying on the language in section 28, First Midwest maintains that because the statute "says that, only 'if' the claimant remains unpaid after ten days, 'then' the claimant may record a lien claim under [section] 7 or file a complaint and enforce the lien" the act of filing the claim and providing notice on the same day necessarily invalidates a lien claim. We disagree.

This same argument was rejected by the Fourth District in A.Y. McDonald Manufacturing Co. v. State Farm Mutual Automobile Insurance Co., 225 Ill. App. 3d 851 (1992). There, an owner disputed the sufficiency of a subcontractor's notice of lien claim, arguing that the notice was insufficient because it "did not precede recording of the lien by 10 days" as required by section 28 of the Act because the subcontractor recorded its claim and sent a copy thereof on the same date. A.Y. McDonald, 225 Ill. App. 3d at 856. The Fourth District found the owner's argument to be without merit, stating:

"Section 28 of the Act addresses the requirements for the recording and enforcement of liens and not notice. [Citation.] It does not require that section 24 notice predate

recording by *** 10 days after notice if payment has not been made. Plaintiff filed its lien and sent notice to [the owner] on February 19, 1987. It then filed its complaint to enforce its lien on October 13, 1987, more than 10 days after notice to [the owner]. Therefore, plaintiff has complied with section 28 of the Act. *Section 24 does not impose any timing requirements for the giving of notice vis-a-vis recording of the lien*." (Emphasis added.) A.Y. McDonald, 225 Ill. App. 3d at 856.

We agree with the Fourth District's well-reasoned analysis. In this case, ALL, like the subcontractor in A.Y. McDonald, recorded its lien claim and sent a copy of its claim on the same date (August 15, 2003), and then filed its complaint to foreclose its lien more than 10 days after providing notice of its claim (September 29, 2003). Accordingly, the mere fact that ALL recorded its claim and sent notice on the same date provides us with no reason to invalidate its claim.

For the forgoing reasons, we find that First Midwest has failed to raise a genuine issue of material fact sufficient to preclude summary judgment. We thus affirm the trial court's order awarding summary judgment in favor of ALL.

**STAIR ONE**

We now turn to the arguments that First Midwest asserts against Stair One, a subcontractor that entered into two subcontracts with CSI to provide labor and materials on the Montreville Project. The first contract, formed on February 15, 2001, called for Stair One to provide the necessary labor and materials to install steel stairs and railings in the Montreville Project in exchange for payment totaling $84,900. The second contract, executed on September 23, 2002, called for Stair One to supply and install balconies in exchange for payment of $270,000.

85

After providing labor and services pursuant to the terms of its two subcontracts, Stair One recorded a mechanic's lien claim with the Cook County recorder of deeds on October 31, 2003, asserting a lien for $197,996. On March 30, 2004, Stair One subsequently filed a counterclaim to foreclose its lien with the circuit court. In its counterclaim, Stair One described the terms of its two subcontracts, identified August 1, 2003, as its completion date and $197,996 as the amount it was owed.

Thereafter, the parties filed cross-motions for summary judgment. Stair One asserted it was entitled to summary judgment against First Midwest because there was no dispute that Stair One had provided materials and services for which it had not been paid and that pursuant to the trial court's previous order, its mechanic's lien had priority over First Midwest's mortgage lien. In support of its motion, Stair One attached the affidavit of Brian Sarver, president of Stair One, who detailed Stair One's two subcontracts and averred that Stair One furnished labor and materials under its subcontracts until August 1, 2003, and that Stair One was owed $180,496, for its services. Moreover, Stair One argued that it was entitled to summary judgment notwithstanding the affirmative defenses that First Midwest had raised in its answer to Stair One's counterclaim because the defenses were meritless. Though First Midwest had argued that Stair One's claim was constructively fraudulent because it asserted a lien for uninstalled materials, Stair One maintained that Sarver's affidavit acknowledged the error, but demonstrated that it was not made with an intent to defraud. Specifically, Sarver stated: "The inclusion of $17,500 for uninstalled material is not constructive fraud. The [sic] Stair One clearly labeled on the lien as uninstalled ($12,500 for window guard rails and $5,000 for 2nd floor rails due on material only 'not installed yet'). The

railings were custom made for this job and at the time the lien was filed Stair One was still negotiating to come back to the job." Moreover, in response to First Midwest's prior argument that it failed to provide sufficient evidence of its completion date and provide completion dates for each of the units it worked on, Stair One maintained that it provided exhibits showing the completion dates for each of its contracts and the individual units.

First Midwest filed a response to Stair One's motion as well as its own motion for summary judgment. First Midwest argued that Stair One failed to perfect its lien because it did not send notice of its lien claim with "delivery limited to addressee only" as required by section 24 of the Act. Moreover, First Midwest maintained that its affirmative defenses precluded summary judgment in Stair One's favor. Specifically, First Midwest maintained that the face of Stair One's lien claim showed it improperly sought to assert a lien for $26,000 in uninstalled material. Moreover, although Sarver's affidavit conceded that Stair One included $17,500 in uninstalled material, Sarver failed to account for $8,500 in other materials clearly labeled uninstalled. First Midwest also argued that Stair One failed to provide sufficient evidence of its completion date and failed to apportion its lien claim and provide completion dates for each of the units on which it worked. Finally, First Midwest argued that Stair One's lien claim included amounts it had previously waived because Stair One had submitted lien waivers for each of its subcontracts. Specifically, First Midwest noted that Stair One submitted a "Waiver of Lien to Date" for its steel railings contract on June 20, 2003. The waiver provided in pertinent part:

"The undersigned, for an in consideration of sixty nine thousand five hundred seventy 00/00 ($69,570) Dollars, and other good and valuable considerations, the receipt whereof

is hereby acknowledged, do(es) hereby waive and release any and all lien or claim of, or right to, lien, under the statutes of the State of Illinois, relating to mechanics' liens, with respect to and on said above-described premises, and the improvements thereon, and on the material, fixtures, apparatus, or machinery furnished, and on the moneys, funds or other considerations due or to become due from the owner, on account of labor services, material, fixtures, apparatus or machinery, furnished to this date by the undersigned for the above-described premises."

First Midwest also pointed to the December 20, 2002, "Waiver of Lien to Date" submitted by Stair One for its steel stairs contract. Stair One's December 20, 2002, waiver contained identical language as its June 20, 2003, waiver for its steel railings contract, except that the consideration for the waiver was $28,688. First Midwest asserted that the waivers were clear and unambiguous and thus valid and enforceable according to their terms. First Midwest further asserted that Stair One's failure to account for its lien waivers resulted in an inflated lien.

Stair One responded, arguing that there was no evidence of reliance on the lien waivers. Stair One pointed to the deposition testimony of Pamela Hitzemann, a senior construction escrow agent at Ticor, who testified that she had no knowledge as to when lien waivers were received and or the extent of her reliance upon them. Indeed, when Hitzemann was shown one of Stair One's lien waivers, she could not recall receiving or reviewing the document and was unsure if the document was ever received by Ticor.

After reviewing the pleadings submitted by both parties, the trial court granted Stair One's motion for summary judgment and denied First Midwest's motion, finding that "Stair One is

entitled to and awarded a valid and subsisting mechanics lien in the amount of $171,996.00, together with statutory interest at the rate of ten percent (10%) per annum from August 1, 2003 (Stair One, Inc's last day of work)." In so holding, the trial court found that: Hitzemann's declaration was entitled to no weight; there was no reliance on Stair One's lien waivers; Stair One did not engage in constructive fraud; and Stair One's notice complied with section 24 of the Act.

First Midwest disputes these findings. Initially, First Midwest asserts that the trial court erred in granting summary judgment in favor of Stair One because Stair One executed unambiguous lien waivers for each of its contracts, which in effect, resulted in a complete waiver of Stair One's lien rights up to the dates identified in the waivers.

Stair One raises the same arguments as Reinke, Just Rite, and ALL concerning the lack of evidence of reliance based on Hitzemann's deposition testimony as well as the burden of proof. As we have already dismissed these arguments above, we need not readdress them here. We do, however, address Stair One's argument concerning the nature of the reliance on its waivers. Specifically, Stair One argues that "the parties treated the waivers as partial waivers for the amount to be paid rather than as waivers of lien to date." In reviewing Stair One's argument, we will review extrinsic evidence relating to the nature of reliance. Merchants, 314 Ill. App. 3d at 863; Premier, 132 Ill. App. 3d at 492.

Initially, we note that Stair One's December 20, 2002, waiver of lien to date was accompanied by a contractor's affidavit that was completed by Brian Sarver, Stair One's president. In the affidavit, Sarver indicated that Stair One's steel stairs contract was valued at $84,900 and that it had only received payment of $10,170.00. Similarly, the affidavit completed by Sarver that

accompanied Stair One's June 20, 2003, waiver of lien to date identified the value of Stair One's steel railings contract as $270,000, and a prior payment of $42,524. Accordingly, like the waiver at issue in Merchants, Stair One's waivers were accompanied by affidavits reflecting that substantial amounts remained due and owing, thus casting doubts on First Midwest's argument that the waivers were relied upon in good faith as complete waivers of lien as to the dates identified in the waivers. Merchants, 314 Ill. App. 3d at 866.

Moreover, the affidavit that Sarver submitted with Stair One's summary judgment pleadings, further supports Stair One's assertion that its waivers were relied upon as partial waivers. In his affidavit, Sarver stated that in order to receive payment, he would, at the request of CSI, "exchange the Waivers of Lien to Date for the payment recited in the waiver." Sarver further averred that he "dated the Stair One waiver and the contractor's affidavit on the date that I signed said document without intending to waive Stair One's lien rights to that date, but to waive Stair One's lien rights to the extent of the payment recited in said waiver. *** CSI through its agent Bassam Haj Yousif knew that the payment being made were for work long previously performed and did not include work to the date of the waivers."

First Midwest has offered no affidavit contradicting the statements asserted in Sarver's affidavit, and accordingly we must accept them as true. Central Illinois Light Co., 213 Ill. 2d at 170-71; F.H. Paschen, 372 Ill. App. 3d at 93. In addition to the contractor's affidavits attached to Stair One's lien waivers and Sarver's uncontradicted affidavit, there is affirmative evidence that Ticor only relied upon Stair One's waivers as partial waivers as to the consideration identified in the waivers. Specifically, Pamela Hitzemann's deposition testimony supports Stair One's

characterization of its lien waiver. At her depositions, Hitzemann was questioned extensively about lien waivers. Although she was not asked to construe Stair One's waivers specifically, she was shown waivers accompanied by contractor's affidavits that contained identical language to Stair One's waivers. Notably, Hitzemann construed them as "partial waivers."

Based on the evidence in the record, which includes Sarver's uncontradicted affidavit, Hitzemann's deposition testimony, and contractor's affidavits affixed to the lien waivers identifying substantial balances that remained due and owing to Stair One, we do not find that there is a genuine issue of material fact that Stair One's lien waivers were relied upon as partial waivers of Stair One's lien rights as to the consideration identified in the waivers. Because we find that First Midwest's lien waiver defense lacks merit, we will not reverse the trial court's summary judgment order on this basis.

First Midwest next asserts that it was entitled to summary judgment because Stair One failed to provide "conclusive evidence that its 'completion date' (as that term is defined under Illinois law) on each unit was within four months of October 31, 2003," the date Stair One filed its lien claim. First Midwest later asserts in its reply brief that Stair One failed to provide "competent evidence" of its completion dates. Stair One contends that First Midwest has waived this argument by failing to raise it in the trial court. Specifically, Stair One maintains that First Midwest never argued that Stair One failed to meet the so-called "conclusive evidence" requirement, but only argued that there were issues of fact concerning Stair One's last day of work on the Project. While the terminology employed by First Midwest on appeal is different from that used in the trial court, the substance of its argument (i.e., that there are fact questions remaining

concerning Stair One's completion dates) is the same. Accordingly, First Midwest's argument is not waived.

For a lien claimant to enforce a mechanic's lien against a third party, the lien claimant must record its lien "within 4 months after the completion" of its work. 770 ILCS 60/7 (West 2006). The purpose of the four-month timing requirement is to ensure that " 'third persons dealing with the property may have notice of the existence, nature and character of the lien as well as the times when the material was furnished and labor performed, and thus be enabled to learn from the claim itself whether it was such and can be enforced.' " (Emphasis omitted.) Merchants, 314 Ill. App. 3d at 869, quoting Schmidt v. Anderson, 253 Ill. 29, 32 (1911). Accordingly, even though section 7 of the Act does not expressly require a lien claimant to provide a completion date in its recorded lien claim, we have held that the "requirement must be inferred," reasoning that "[w]ithout a completion date, a person examining the lien claim would not know whether the four-month filing requirement had been met." Merchants, 314 Ill. App. 3d at 869.

First Midwest does not dispute that Stair One's lien claim recorded with the Cook County recorder of deeds was supported by several exhibits pertaining to Stair One's completion dates for both of its subcontracts. An exhibit marked "Exhibit 2" identifies August 1, 2003, as the completion date for both of Stair One's contracts. It specifies that the steel stairs (contract 1), roof rails, window guard rails, and second-floor rails (contract 2) were completed on August 1, 2003. An exhibit marked "Exhibit 3" further breaks down the completion dates for its second contract, providing completion dates for each unit in which it installed residential balcony rails. The completion dates range from July 21, 2003, to July 30, 2003.

First Midwest asserts, however, that Stair One failed to provide any records substantiating the completion dates identified in the lien claim. Moreover, First Midwest asserts that the completion dates identified in the claim for the individual condominium units are actually contradicted by AMEC's daily logs. Specifically, First Midwest maintains that AMEC's daily logs show that Stair One was not on site "on at least five" days that Stair One identified as completion dates for individual units. First Midwest does not cite to the record where these logs exist, and indicates in its reply brief that it "expect[ed] to seek to supplement on appeal with these logs." To our knowledge, no such effort has been made. Accordingly, First Midwest has produced no evidence to show that Stair One's completion dates are incorrect. Accordingly, we find that First Midwest has failed to raise an issue of fact concerning Stair One's completion dates. See, e.g., First Federal Saving & Loan Ass'n of Chicago v. Connelly, 97 Ill. 2d 242, 246 (1983) (finding that a mechanic's lien claimant complied with section 7 of the Act because the mortgage lien holder failed to offer any evidence contradicting the completion date identified in the recorded lien claim).

First Midwest next maintains that the trial court's summary judgment order should be reversed because Stair One failed to perfect its lien claim when it failed to serve notice of its lien claim with "delivery limited to addressee only," as required by section 24 of the Act (770 ILCS 60/24 (West 2006)). Stair One acknowledges that its notice was not sent with "delivery limited to addressee only," but asserts that this the technical deficiency in its section 24 notice should not serve to invalidate its lien claim because there is no dispute that its notice was actually received.

Section 24 requires that a lien claimant's notice of claim "be sent by registered or certified mail, *with return receipt requested and delivery limited to addressee only*, to or personally served

93

on the owner of record or his agent or architect, or the superintendent having charge of the building or improvement and to the lending agency, if known." (Emphasis added.) 770 ILCS 60/24 (West 2006). Illinois courts, however, have overlooked technical deficiencies in service of section 24 notice when there is no dispute that the notice was actually received. See, e.g., J&B Steel Contractors, Inc. v. C. Iber & Sons, Inc., 246 Ill. App. 3d 523, 526 (1993) (declining to invalidate the lien claimant's mechanic's lien claim even though the notice did not limit delivery to addressee only because the technical deficiency did not result in a lack of actual notice); Watson v. Auburn Iron Works, Inc., 23 Ill. App. 3d 265, 272-73 (1974) (same); see also A.Y. McDonald, 225 Ill. App. 3d at 857 (finding that although the lien claimant's notice did not strictly comply with the requirements of section 24 of the Act because it was sent via regular mail as opposed to registered mail, this technical deficiency did not provide a reason to invalidate the claim because notice was actually received).

In this case, the record reveals that Stair One's notice of lien claim was delivered to North Star, CSI, and CoVest, First Midwest's predecessor-in-interest, and that persons from each company signed for the notice. Mail cards and receipts show that Stair One's notice was sent via certified mail, with return receipt requested, but that it was not limited to addressee only. Although Stair One's notice failed to strictly comply with the requirements of section 24, we will not invalidate Stair One's lien claim based on this technical deficiency because there is no dispute that its notice was actually received by all parties. J&B Steel, 246 Ill. App. 3d at 526; Watson, 23 Ill. App. 3d at 272-73.

Finally, First Midwest asserts that it was entitled to summary judgment because Stair One's

94

lien claim included $26,000 in uninstalled and undelivered material and was thus constructively fraudulent.

As a rule, a lien claimant may not assert a lien for undelivered materials and a party errs in asserting a lien for such material. 770 ILCS 60/7 (West 2006); Colp v. First Baptist Church, 341 Ill. 73, 78-79 (1930). Section 7 of the Act provides that a lien claim that contains an error or an overstatement will not be defeated unless the said error or overstatement was made with an "intent to defraud." 770 ILCS 60/7 (West 2006). When there is evidence that a lien claimant knowingly recorded a claim that contained a "substantial overcharge," the claim will be defeated on the basis of constructive fraud because "the effect of his actions is to give an appearance of a greater encumbrance on the property than that to which he is entitled." Lohmann, 260 Ill. App. 3d at 891; see also Peter J. Hartmann Co., 353 Ill. App. 3d at 706; Fedco, 77 Ill. App. 3d at 51.

Stair One's lien claim, recorded on October 31, 2003, identified $197,996 as the balance due under its two subcontracts. Stair One attached several exhibits to its lien claim and clearly labeled several charges for uninstalled material, including $12,500 for "window guard rails," $5,000 for "2nd floor rails," and $500 worth of materials in 17 individual condominium units. Altogether, Stair One's lien claim contained $26,000 in uninstalled materials. At his deposition, Brian Sarver, the president of Stair One, testified that uninstalled materials were not delivered to the jobsite.

Later, in its motion for summary judgment, Stair One acknowledged that its lien claim incorrectly included uninstalled materials, but asserted that the mistake did not amount to constructive fraud because it did not act with the requisite intent to defraud. In support of its

claim that it did not act intentionally, Stair One relied upon the affidavit submitted by Sarver. In his affidavit, Sarver conceded that Stair One's lien claim included $17,500 in uninstalled material, but maintained that "[t]he inclusion of $17,500 for uninstalled material is not constructive fraud. The Stair One lien clearly labeled on the lien as uninstalled ($12,500 for window guard rails and $5,000 for 2nd floor rails due on material only 'not installed yet'). The railings were custom made for this job and at the time the lien was filed Stair One was still negotiating to come back to the job." Accordingly, after accounting for $17,500 in uninstalled material, Sarver averred that Stair One was entitled to a lien claim totaling $180,496. Stair One further reduced the amount it was seeking in its reply in support of its motion for summary judgment to account for an additional $8,500, reflecting the $500 in uninstalled materials for the 17 individual condominium units. In its reply, Stair One stated that its "Claim for Lien included $26,000 as uninstalled and clearly labeled it as such. Since the material was not later installed under the contracts before this court, it is not part of the lien herein. Upon discovery of this error, Stair One immediately admitted the mistake. No one has asked that the recorded lien be corrected which Stair One is willing to do immediately." At the conclusion of its motion, Stair One requested a lien award of $171,996, taking into account the $26,000 in uninstalled undelivered materials.

Accordingly, Stair One concedes that is lien claim was overstated by $26,000, but argues "it is clear that Stair One did not intentionally inflate its lien for the purpose of defrauding or prejudicing First Midwest or any other party." We agree.

Sarver's uncontradicted affidavit refutes First Midwest's contention that Stair One's inclusion of the $26,000 in uninstalled material was done with the intent to defraud. Indeed,

Sarver's affidavit explained that at the time Stair One's lien claim was filed it was engaged in negotiations to return to the Project. Moreover, Stair One's claim clearly identified that materials that had not yet been installed. While we note that Stair One never filed an amended claim correcting the amount asserted in its lien, it clearly acknowledged its error in its summary judgment pleadings and requested a reduced lien award, which took into account the $26,000 error. The mere existence of an error in a mechanic's lien claim is not cause to defeat the claim; rather such a claim will only be defeated if there is evidence that the error was made with an "intent to defraud." 770 ILCS 60/7 (West 2006). Here, First Midwest failed to present any evidence that Stair One's error was made with an intent to defraud and accordingly has failed to raise a genuine issue of material fact sufficient to preclude summary judgment on its constructive fraud defense.

For the foregoing reasons, we affirm the trial court's order granting summary judgment in favor of Stair One.

In conclusion, we affirm in their entirety the trial court's orders granting summary judgment in favor of Inland, Just Rite, ALL, and Stair One. We affirm as modified the trial court's orders awarding summary judgment in favor of AMEC and Reinke.

Affirmed as modified.

QUINN, P.J., and THEIS, J., concur.